**William W. WINPISINGER et al., Plaintiffs,**

v.

**AURORA CORPORATION OF ILLINOIS, PRECISION CASTINGS DIVISION, et al., Defendants.**

**No. C75–589.**

United States District Court,
N. D. Ohio, E. D.

Feb. 21, 1978.

---

Roger B. Hunt, Donald J. Wood, Haussermann, Davison & Shattuck, Boston, Mass., and Bourne P. Dempsey, Haase, Dempsey & O'Loughlin, Cleveland, Ohio, for plaintiffs.

Mortimer Riemer, Riemer & Oberdank, Cleveland, Ohio, Michael E. Fox, Scott A. Lathrop, Adams, Fox, Marcus & Adelstein, Chicago, Ill., Robert A. Goodman, Peter R. Harwood, Cleveland, Ohio, Jerome S. Cohen, Plans Benefits Security Div., Washington, D. C., Ebert Weidner, John A. Hallbauer, Cleveland, Ohio, for defendants.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, District Judge.

This class action was brought against the individual defendants as representatives of former employees of Precision Castings

Company Division of Aurora Corporation with plants in Cleveland, Ohio and Fayetteville, New York, and against the Aurora Corporation of Illinois. Plaintiff Winpisinger and the other plaintiff-trustees (equally union and employer Trustees) of the I.A.M. National Pension Fund (hereinafter Fund) seek a declaration of lawfulness with reference to an amendment to the National Pension Plan (the Plan) which they adopted June 12–13, 1975, effective June 30, 1974. The amendment cancelled the past service credits that the individual defendants and the other class members had under the Plan. The plaintiffs request that the declaration be binding upon all members of the class and the Aurora Corporation.

An Agreement and Declaration of Trust (Trust Agreement) was executed May 1, 1960 between the International Association of Machinists and Aerospace Workers, AFL–CIO (I.A.M.) and "various employers of members of the International Union who are or may become parties to this Agreement." As one premise of the Trust Agreement, the first whereas clause recognized that:

> various local and District Lodges of the International Union, and the International Union and Employers have entered into or expect to enter into collective bargaining agreements which provide, among other things, for the establishment of a Pension Fund and prescribe the contributions or payments to be made by the Employers to such Fund.

The Trust Agreement authorized the Trustees, subject to express limitations including "laws governing trust funds of this nature," to amend the "Agreement and Declaration of Trust in any respect from time to time." The Trust Agreement also authorizes the Trustees to specify a written plan of benefits which details the "basis on which payment of benefits is to be made pursuant to this Agreement." As amended through September 1, 1974, the Trust Agreement provides that "The Plan" comprises "Benefit Plan A (formerly the I.A.M. Labor-Management Pension Fund) and Benefit Plan B (formerly the I.A.M. Mid-Eastern Pension Plan)." The Plan presently in issue is Benefit Plan A.

In 1965, Precision Castings Company (Precision) and a local lodge of I.A.M. executed a collective bargaining agreement covering 18 employees at Precision's Cleveland plant. In 1971, Precision, with its two plants (Cleveland and Fayetteville) became a division of Aurora Corporation of Illinois. Aurora assumed the I.A.M. collective bargaining agreement and continued it until Aurora closed the Cleveland plant on July 12, 1974.

On or about December 1, 1965, Precision executed Participation Agreements and all other necessary documents to become a Contributing Employer to the Fund. One participation agreement covered the 18 I.A.M.-represented employees at its Cleveland plant (I.A.M. employees). Two other participation agreements covered 376 "non-I.A.M." employees. One agreement covered those hourly employees represented by the Federal Labor Union (Cleveland plant only) and the other agreement covered non-union personnel at both Cleveland and Fayetteville plants. The express terms of the Plan provided for the non-I.A.M. employees to become Plan participants.[1]

Contributions on behalf of the two Special Classes of participants[2] have been

---

1. Under the heading "Acceptance of Special Classes of Employees of a Contributing Employer," Article II, section 8, provides:

 The Trustees may accept for participation in the Fund classes of employees who are employed by a Contributing Employer and who are not represented for the purpose of collective bargaining by a Lodge on the following conditions: [The 1974 pension plan booklet lists conditions (a) through (j).]

2. Certifying this action as a class action on April 28, 1976, this court divided the class of defendants into two sub-classes as follows:

 (1) Former employees of Precision in Cleveland, Ohio who were represented by, and were members of, the Federal Labor Union, No. 24387, AFL–CIO, and who, in November of 1973, became represented by the Metal Polishers and Helpers Union, AFL–CIO, Local 500 (the "union subclass"); and

made continuously from the initial Contribution Date of November 29, 1969 until June 30, 1974. Contributions were made first by Precision and then by Aurora on behalf of: the 18 or more I.A.M. participants; approximately 601 participants in Cleveland who were represented by the Federal Labor Union (or its successor the Metal Polishers, Platers and Helpers Union); approximately 85 non-union participants in Cleveland; and approximately 77 non-union participants in Fayetteville. After the July closing of the Cleveland plant, Aurora continued to pay contributions for the Fayetteville non-union participants until November 17, 1974 when the Trustees refused to accept further contributions and refunded post-June 30 contributions.

By June 30, 1974, the following non-I.A.M. participants had qualified for vested rights under Article IV of the Plan on the basis of attained ages and credited service, subject to verification of age and credited service: approximately 93 members of the Metal Polishers Union; approximately 22 non-union personnel in Cleveland; and approximately 19 non-union personnel in Fayetteville.

Inasmuch as only eight years and seven months elapsed between November 29, 1965 and June 30, 1974, the covered employees mentioned in the preceding paragraph who qualified for vested rights under Article IV as of June 30, 1974, were necessarily relying in part on Past Service Credit (granted by Article III of the Plan), i. e., credit for pre-December 1, 1965 service.

At a meeting held June 12–13, 1975, the Board of Trustees adopted amendments to Benefit Plan A, all of which were made retroactive to January 1, 1975, except Item C. Item C, which was made retroactive to June 30, 1974, amended Plan A by adding to Article II, section 8, a new subsection (k), which provided:

(k) If the participation of a Contributing Employer with respect to a special class

(2) Present and former employees of Precision in Cleveland and Fayetteville, New York

of Employees shall terminate for any reason, all Past Service Credit for the special class employees shall be cancelled retroactively, notwithstanding any contrary provision of this Plan, except that pensions which were effective prior to the termination of the special class of employees shall not be reduced unless the total amount contributed, less benefit payments already made, is less than the actuarially determined value of the pension benefits thereafter payable with respect to such Pensioners.

This amendment had the effect of cancelling the Past Service Credit (provided under Article III of said Plan) of the Special Class employees, i. e., the non-I.A.M. participants. Participants who were represented by the I.A.M. were not affected by the amendment of June 12, 13, 1975.

An annual actuarial valuation and review of the Plan (dated December 31, 1974) was prepared by the Segal Company and made available to the Trustees prior to their meeting of June 12–13, 1975. Consideration and review of the report at that meeting prompted a concern on the part of the Trustees that $2.6 million in benefits would have to be paid out to the Special Classes of employees without matching contributions being made by their employer.

The total sum of contributions made to the Fund by Precision and Aurora for all members of the Special Classes was $1,223,775.20. Side by side, the total projected liability of the Fund for all the members of the aforementioned Special Classes at Precision who had potential vested rights to benefits (assuming no cancellation of Past Service Credit) under the terms of the Plan as of July 12, 1974 amounted to $3,794,279 as follows:

a. Members of Special Class represented by Metal Polishers, Platers and Helpers Union, AFL–CIO at Cleveland plant $1,565,339

who were not represented by a Union (the "non-union subclass").

b. Members of Special Class not represented by Union at Cleveland plant 393,847

c. Members of Special Class not represented by Union at Fayetteville plant 549,714

d. Pensioner Liability 1,285,379

According to the Fund's actuarial consultant, the total accrued liability of the Fund, as of the end of the fiscal year (December 31, 1973), amounted to $436,177,500, including an unfunded liability of $340,019,900.

Between July 12, 1974 and June 26, 1975, approximately 21 members of the Special Classes including defendant Elizabeth M. Shrover, were awarded pensions and received pension payments. The plaintiff-trustees ceased making such payments when they cancelled the past service credit. However, to date, the pensions of members of the Special Classes who were pensioners on or before July 12, 1974 have not been reduced pursuant to the amendment of June 12–13, 1975.

Plaintiff-trustees ask this court to declare and adjudge that the cancellation of the past service credit of members of the Special Classes, accomplished through the addition of Article II, section 9, sub-section (k), was lawful and in accordance with the plaintiff-trustees' powers, obligations and duties under the Trust Agreement and the Plan. Defendants, sued as representatives of the Special Classes, have filed answers denying the claims of the plaintiffs. In addition, these defendants, both for themselves and for the classes they represent, have filed counter-claims that seek to have the action of the plaintiff-trustees declared null and void and to have all pension benefits reinstated as of July 12, 1974.

The defendant Aurora Corporation of Illinois, Precision Castings Division, named as a defendant, has answered and counter-claimed alleging that the actions of the plaintiff-trustees were unlawful and should be voided.

The plaintiffs allege and it is determined that this court has jurisdiction to entertain this declaratory action by virtue of section 502(e), 29 U.S.C. § 1132(e), of the Employee Retirement Income Security Act of 1974 (ERISA), Pub.L. 93–406 (Sept. 2, 1974). The plaintiff-trustees as fiduciaries under this jurisdictional provision bring this action "to obtain . . . appropriate equitable relief . . . to enforce . . . terms of the plan."

On March 31, 1976, this court granted a motion to intervene filed by the Secretary of Labor over the objection of the plaintiffs. The Secretary had asserted violation of plaintiff-trustees of section 404(a)(1) of Title I of ERISA, 29 U.S.C. § 1104(a)(1).[3] Noting that this section became effective on January 1, 1975, this court denied the plaintiff's claim that "the cause of action accrued before ERISA." Plaintiffs' argument was premised on the proposition that the Trustees' resolution of June 12–13, 1975 related back to the closing of the plant on July 12, 1974, before ERISA became law on September 2, 1974. This court determined:

Since the action of the plaintiff-trustees regarding the subject pension fund occurred after January 1, 1975, it falls within the reach of section 404(a) and will be governed by applicable provisions of ERISA.

The record consists of responses of the plaintiff-trustees to requests for admissions; the deposition testimony of trustees William W. Winpisinger (vice president of I.A.M.), Francis I. Thompson (executive director of New England Motors Freight Carriers), Fund administrator Frank A. Higgins, and two executives of the Martin E. Segal Company (Segal) which has served "as the only actuarial consultant to the Trustees from the Plan's inception." Shepard A. Sheinkman is senior vice president and account executive of Segal who acted as liaison to the Plan and Jack M. Elkin is senior vice president and chief actuary of Segal. Other evidence in the record in-

---

**3.** Hereafter referred to as 404(a)(1) or 1104(a)(1) this section is entitled "Fiduciary duties." The text of 1104(a)(1) is quoted infra, at p. 565.

cludes a stipulation of facts, and a number of exhibits the authenticity of which is accepted by the parties.

At the oral hearing of August 15, 1977, after reciting language of the March 31 memorandum including the earlier quotation from that memorandum, this court reaffirmed "those statements and conclusions." Then in answer to question 3 of the class action notice, this court stated:

I conclude and determine that the instant action is indeed an action arising under Title I of the Employee Retirement Security Act of 1974 (ERISA).

Proceeding from that determination, the core questions were then isolated:

It seems to me that the questions are probably best articulated in terms of the wording of 404(a) and more particularly as set forth in [notice] question 4 which reads: "If the instant action is an action under Title I of ERISA, did the Plaintiff Trustees in cancelling said past service credits fail to act solely in the interest of the plan participants and beneficiaries or in accordance with the documents and instruments governing the plan as required under 404(a)(1) of ERISA, 29 U.S.C. section 1104(a)(1).

The parties were "advised to deal with both aspects of the matter." After discussion of a possible factual issue of bad faith, the further course of the case was thus defined:

I am prepared to proceed on that basis to reserve the issue of bad faith until I have ruled on all the others and meet it only if we have ruled in a way that makes that issue crucial in determining the final outcome of this case. Now, let's talk about a briefing schedule here.

## I.

The fiduciary duties stated in 1104(a)(1), creating the standard by which the conduct of the plaintiff-trustees is to be measured, will now be assessed. In its entirety, 1104(a)(1) reads:

(a)(1) Subject to section 1103(c) and (d), 1342, and 1344 of this title, a fiduci-

ary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries;

and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter.

 Section 1342 that authorizes the Pension Benefit Guaranty Corporation to terminate a pension plan and section 1344 which fixes the order of priority of participants and beneficiaries upon termination of the plan, shed no light on the fiduciary duties and need not be examined further. In contrast, sections 1103(c) and (d) do help illuminate the fiduciary duties by stating:

[T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

Since the fiduciary duty stated in 1104(a)(1) is made subject to this language of 1103(c) and (d), the obvious intent of Congress is that 1104(a)(1)(A) shall mean that "the assets of a plan shall never inure to the benefit of any employer," thus forever forbidding employer self-dealing in the Fund's assets. To prevent self-dealing by either

the employer or any fiduciary, the fiduciary shall discharge his duties:

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

The lead line that precedes (A), section 1104(a)(1), orders a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." Not mentioning this language, and citing only the "exclusive purpose" provision of (A), the plaintiffs argue that "404(a)(1) of ERISA . . . as the language itself suggests, simply prohibits self-dealing—an issue which is not involved in this case." This is correct so far as (A) is concerned. But plaintiff goes on to urge that,

The scope of Part 4 of ERISA, entitled "Fiduciary Responsibility" . . . is confined to Trustee misconduct and imprudence and *not* to vesting.

Of course the explicit vesting provisions of ERISA, Part 2, "Participation and Vesting" (sections 201 through 211 of Title I, 29 U.S.C. §§ 1051 through 1061), do not apply to the present case, since they are not effective as to any plan year starting prior to December 31, 1975. However, plaintiffs' argument cannot be accepted if plaintiffs are saying that the language "solely in the interest of the participants and beneficiaries" adds nothing to the provision of (A) and cannot be interpreted to require the trustees to treat "vesting" solely in the interest of participants. The quoted phrase applies not just to (A), the "exclusive purpose" requirement, but to all the distinct requirements of sub-paragraphs (A)(B)(C) and (D) including the requirement of (D) that the fiduciary must discharge his duties "in accordance with the documents and instruments governing the plan." Hence the lead line of section 1104(a)(1) imposes a separate and overall requirement upon the trustees to discharge all of their duties "solely in the interest of the participants and beneficiaries"—Congress thereby added a responsibility over and above the prohibition against self-dealing.

 In addition to reinforcing the prohibition against self-dealing provided by (A), the lead line of (a)(1) is construed to require that in the discharge of his duties with respect to a plan (referring to the administration of a plan rather than to its establishment) the fiduciary is forbidden from granting preference as between a plan's participants or as between a plan's beneficiaries.[4] Bearing in mind that a fiduciary in discharging his duties must not grant preferences, this court will next examine the conduct of plaintiff-trustees as measured by requirement (D) of 1104(a)(1) relating to the governing documents and instruments of the Plan.[5]

**4.** No legislative history has disclosed an express Congressional intent or purpose in selecting or using the "solely" phrase. However, Senate Report 93–127, p. 4865 *U.S.Code Congressional and Administrative News,* 93rd Congress, 2d Session, 1974, Vol. III; and House Report 93–533, p. 4650, same volume, in identical language, state:

. . . a fiduciary standard embodied in Federal legislation is considered desirable because it will bring a measure of uniformity in an area where decisions under the same set of facts may differ from state to state. It is expected that courts will interpret the prudent man rule and other fiduciary standards bearing in mind the special nature and purposes of employer benefit plans intended to be effectuated by the Act.

Thus it was within the intent of Congress that courts should interpret the "solely" requirement bearing in mind the Act's purposes. Congress found in Title I, section 2, that:

despite the enormous growth in such plans many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans.

From this it is implied that Congress intended that the fiduciary duties requirements of 404(a)(1) should be interpreted so that employees with long years of employment would not lose "anticipated retirement benefits" when under plans that contain vesting provisions a loss is caused by a fiduciary's preferential treatment of participants or beneficiaries.

**5.** In the adjudication of this case, it is neither material nor necessary to construe the "prudent man rule" of subparagraph (B) nor the diversification requirement contained in subparagraph (C) of 1104(a)(1).

■ With ERISA's standard of fiduciary duties thus formulated, the standard applies to the Trustees' retroactive cancellation of the past service credit of Precisions' Special Classes of employees. The pre-ERISA standard of judicial review of pension fund fiduciary conduct was "whether the Fund's actions were arbitrary or capricious in light of all the circumstances involved." *Norton v. I. A. M. National Pension Fund,* 180 U.S.App.D.C. 176, 180, 553 F.2d 1352, 1356 (1977).[6] Under *Norton,* the fiduciary's action stands if it is rationally related to any legitimate purpose of the fund. This pre-ERISA test of judicial review is not implicitly approved or rejected by any part of ERISA. Nevertheless, the more specific standards of ERISA, rather than the pre-existing rational nexus test, are deemed to now prescribe the standards for fiduciaries of a pension fund which is subject to 1104(a)(1) of ERISA as the Fund here is determined to be. Hence, judicial review of a pension fiduciary's conduct requires a court to determine whether the ERISA standard of fiduciary responsibility has been satisfied.

## II.

■ The Trust Agreement and the Plan are "documents and instruments" in accordance with which the plaintiff-trustees were required by 1104(a)(1)(D) to discharge their duties. Article XII, section 2, "Vested Rights," of the Trust Agreement specifies:

> No employee or any person claiming by or through such employee, including his family, dependents, beneficiary and/or legal representative, shall have any right, title or interest in or to the Fund or any property of the Fund or any part thereof except as may be specifically determined by the Trustees.

A provision of Article X of the Plan, section 5, "No Vesting," provides:

*Except as specifically provided in this Plan,* no person, other than the Trustees of the Fund, shall have any right, title or interest in any of the income or property of any character received or held by or for the account of the Fund, and no person shall have any vested right to benefits provided by the Fund, nor shall any employee be entitled to any payment or other equity in the assets of the Fund. All contributions made to the Fund shall be held in trust for the exclusive benefit of Covered Employees who qualify for pensions under this Plan. [Emphasis added.]

■ Within the exception of this "No Vesting" provision, the Plan *does* make specific provision for vesting in Article IV, section 4, "Vesting," which provides:

> A Covered Employee shall have a vested right to receive his pension when he reaches retirement age if he meets these requirements:
>
> (a) he has attained age 50;
>
> (b) he has *at least* 10 years of Credited Service which include at least 5 years of Future Service credit; and
>
> (c) he applies for his pension in the form and manner provided in this Plan.

As stipulated, by June 30, 1974, ninety-three members of the Metal Polishers Union Special Class and the forty-one members of the non-union employees Special Class "had qualified for vested rights under Article IV of the Plan on the basis of attained ages and credited service subject to verification of age and credited service." Notwithstanding this stipulation, the plaintiff-trustees argue:

> [T]he vested rights set forth in Article IV, section 4 of the Plan are subject either specifically or implicitly to various other parts of the Plan, including: (1) Article IX dealing with termination of

---

**6.** The fiduciary conduct under review in *Norton, supra,* was the 1973 (pre-ERISA) amendment by the I.A.M. National Pension Fund trustees (the present plaintiffs) of Article IX, section 4 of the Plan (the section has since been repealed) that had the effect of cancelling all of Norton's credited service (past and future).

Reversing the trial court, the D.C. Circuit determined that the conduct was arbitrary and capricious. It concluded that *Norton* was entitled to an early retirement pension "calculated with reference to all of his credited service including past service."

participation, (2) Article X dealing with amendments, and (3) Articles II, III and VIII dealing with Special Class participation and the general discretion and rule-making powers of the Trustees with respect to Special Class members.

In fact the Plan subjects Article IV to only one other article. Article IV, section 4, "Vesting," provides that "the vested right of a Covered Employee shall be subject to the provisions of ARTICLE IX of this Plan." The Fund administrator, Higgins, in deposition has testified that in the Trustees' judgment, Article IX, sections 3 and 4 do not "fit the situation." As only sections 3 and 4 could arguably support a contention that Article IX effects the provisions of Article IV, section 4, "Vesting" in this case, and since examination of Article IX [7] supports the Trustee's position as reported by Higgins, Article IX has no effect on the Plan's vesting provisions in Article IV, section 4, in this case. As seen, no provision of the Plan or Trust Agreement other than Article IX is specified as a limitation on the rights of a covered employee which have vested under Article IV, section 4. Any other provision cited by the plaintiff may only be offered as a source of implied authority for the contested action of the trustees in adopting the new subsection (k) as an addition to Article II, section 8, "Acceptance of Special Classes of Employees of a Contributing Employer," to effectively divest the rights of non-I.A.M. participants.

The plaintiffs claim several sources of implied power. One is Plan's Article X, section 1, "Amendment: "

> The Trustees may amend or modify this Plan at any time in accordance with the Agreement and Declaration of Trust establishing the Pension Fund [with certain limitations not here pertinent].

Also cited by the Trustees is Plan Article VIII, section 3, "Action of Trustees," which states in subsection d that:

> The Trustees shall be the sole judge of:
> . . . the crediting of Future or Past Service, and the decisions of the Trustees with respect to any of the foregoing shall be final and binding on all the parties.

Further, the Trust Agreement, Article VI, "Plan of Benefits," gives the Trustees "full authority to determine all questions of nature, amount and duration of benefits to be provided" (section 1), and "full authority to determine eligibility requirements for benefits and to adopt rules and regulations setting forth same which shall be binding on the employees and their beneficiaries" (section 3). None of the above listed powers expressly authorizes the Trustees to cancel past service credit; and there is a fundamental reason why these may not impliedly accomplish such result.

[7]. Section 1 of Article IX, "General," merely states the purpose of Article IX, while section 2, "Causes of Termination" allows for termination under specific factual circumstances that are not applicable here, e. g., failure to pay contributions, etc.

Section 3 of Article IX, "Short Term Contributing Employers," concerns the termination of participation of a contributing employer who goes out of business within forty-eight months of its contribution date or if within forty-eight months of the contribution date the number of covered employees employed by the contributing employer is less than fifty percent of the original number employed on the contribution date. Since Precision continued as a contributing employer from November 29, 1965 to July 12, 1974, the termination of Precision's participation in the fund was not covered by the forty-eight-month condition of section 3.

Section 4 of Article IX "Withdrawal by Active Employers," relates to the termination of participation of a contributing employer who "thereafter continues in the same or related business." Whether Aurora so qualifies is not clear. Even if applicable to Aurora, section 4 does not warrant cancellation of past service credit of the special classes. Assuming section 4a is satisfied,

> then all Credited Service based upon employment with such employer shall be cancelled retroactively, notwithstanding any contrary provision of this plan. [Emphasis added.]

Manifestly, this section could not be selectively enforced. Since the trustees cancelled the past service credit of the special classes but not the past service credit of I.A.M. employees of Precision, the trustees did not cancel "all credited service." Therefore, Article IX, section 4a of the Plan cannot validate retroactive cancellation of past service credit of only the special class employees.

■ Article VI, section 5, "Written Plan of Benefits," of the Trust Agreement directs the Trustees to specify in writing[8] "the detailed basis òn which payment of benefits is to be made pursuant to this agreement . . . subject, however, to such changes and modifications by the Trustees from time to time as they in their discretion may determine." Surely the scriveners of the Trust Agreement in requiring that the basis of benefits be detailed in writing meant that the final written product forthrightly reflect the Plan. They could not have intended, and any implied powers will not be read, to subsume in the detailed Plan a hidden power to cancel express benefits through retroactive modification.

■ Participants and beneficiaries reading Article IV, section 4 are therefore entitled to rely on the unequivocal language of the "Vesting" section of Article IV, section 4. It tells a covered employee that he is entitled to receive his pension when he reaches retirement age and meets the specified requirements.[9] The vesting requirements of Article IV, section 4 have been satisfied by the Precision employees composing the two Special Classes. By retroactively divesting these Special Classes of their past service credit (under Article III of the Plan) and thereby disqualifying these Special Class members from their right to pensions upon the attainment of retirement age, it is concluded and determined that, in violation of 1104(a)(1)(D), the plaintiff-trustees failed to discharge their fiduciary duties with respect to the Plan "in accord-

ance with the documents and instruments governing the plan.[10]

■ Furthermore, the plaintiff-trustees favored and preferred I.A.M. employees of Precision over the Precision Special Class employees. The past service credit of the I.A.M. employees was not affected while the past service credit of the Special Classes was cancelled by the Plan amendment of June 12–13, 1975. The plaintiff-trustees thus failed to discharge their fiduciary duties with respect to the Plan "solely in the interest of the participants and beneficiaries" of the Plan, as ERISA requires. Furthermore, the preferential treatment thus accorded Precision's I.A.M. employees violates the Plan's Article VIII, section 3, "Action of Trustees" requirement that in being the "sole judge" of "the crediting of Future or Past Service," a discretionary power, "the Trustees shall exercise such powers in a uniform and non-discriminatory manner."

### III.

#### A.

Despite the conclusions just reached, consideration will be given to the two principal arguments of the plaintiff-trustees. Each is based on claimed implied powers of the plaintiff-trustees arising under either their general powers already cited or under powers that relate to the Special Class employees. At the August 15, 1977 oral hearing, counsel for the plaintiff-trustees stated:

8. Section 402 of Title I of ERISA, 29 U.S.C. § 1102(a)(1) similarly provides that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument."

9. The pension plan booklet reinforced such belief. Under the heading "Vesting" it states at p. 28:
 To be entitled to this right, the Covered Employee *must*:
 1. be at least 50 years old; and
 2. have at least 10 years of credited service, 5 years of which must be future service credit.

10. Plaintiff-trustees attempt to justify the cancellation of past service credit by resort to

ERISA section 3(37), 29 U.S.C. § 1002(37). In substance, part of the definition of "multi-employer plan," permits a multi-employer plan to provide that past service credit may be forfeitable upon an employer's cessation of contributions. While a multi-employer plan may encompass a plan that permits the forfeiture of past service credit on an employer's cessation of contributions, reliance on section 3(37) of Title I is inapposite. Here, such a permissive provision is absent from the plan documents. Accordingly, the ERISA statutory language and the Internal Revenue Regulation, section 1.411(a)–4, that have been cited in support of this argument are inapplicable.

We believe the differentiation in this case was justified by the special nature of the Special Classes and that indeed the discrimination with all the unpleasant connotation of that word was justified.

Counsel for the plaintiff-trustees thus further developed this argument in their first brief:

In Benefit Plan A, the participation of Special Classes is subject to special rules to be adopted by the trustees from time to time in the light of the special characteristics of Special Classes. This special status is contemplated by the particularized and selective discretion reserved to the Trustees in the third paragraph of section 1 of Article II.

The referenced third paragraph relates to the various classes other than employees represented by a lodge of the I.A.M. for whom "the Trustees have decided to permit participation." Plaintiff-trustees draw attention especially to the last sentence which commences by stating "[s]uch participation shall be on the terms and conditions determined by the trustees, at their discretion." Plaintiff-trustees emphasize the fact that Precision's two Special Classes of covered employees consisted of approximately 375 persons (Cleveland and Fayetteville) whereas on December 31, 1974, there were only 2,140 Special Class employees in the whole Plan. They compare these figures with the more than 75,000 active I.A.M. covered employees, and conclude by characterizing the Precision Special Classes as an "anomaly among the more than 2,000 contributing employers in Benefit Plan A."

Plaintiff-trustees imply that the Special Classes were thrust upon the Fund. This implication is refuted by the provision to which they refer which states that "such participation shall be on the terms and conditions determined by the trustees, at their discretion." At the time that Precision submitted lists of employees for participation in the Plan, the Fund's office performed actuarial calculations by studying the non-I.A.M. employees separately from the I.A.M. employees. This first study concluded that the non-I.A.M. group met the test for a Standard Benefit Level. The study of the I.A.M.-represented employees concluded that this group met the test for Benefit Level B. When the Fund office combined all the listed employees at both plants, it concluded that on the basis of their average age and average years of service, all groups of employees combined could be admitted into the Plan at the Standard Benefit Level. Thus, the I.A.M. employees received a higher level of benefits by reason of the 375 Precision employees who comprised the two Special Classes entering the Fund. Hence the Special Classes were freely admitted to the Fund benefiting the I.A.M. lodge members by their admission.

■ The last sentence of the third paragraph of Article II, section 1, limits the Trustees discretion in determining the terms and conditions applicable to Special Classes. Thus it ends with the proviso:

. . . that such discretion shall be exercised in a nondiscriminatory manner and the acceptance of the group will not impair the actuarial soundness of the Fund.

While the Trustees were required to exercise their discretion in a non-discriminatory manner, they were not required to accept the group if acceptance would "impair the actuarial soundness of the Fund." Touching the same subject, Article II, section 8(e) expressly authorized the Trustees to set a contribution rate for the special class of employees,

higher than the Contribution Rate for the employees represented by the Lodge for the purpose of collective bargaining if such higher Contribution Rate is necessary to produce the same level of benefits for the special class employees as for the employees of the Contributing Employer represented by the Lodge.

Thus it becomes clear that as a condition of accepting into the Fund Precision's two Special Classes of employees, the Trustees, effective November 29, 1965 (Precision's Contribution Date), could have set higher contribution rates for the Special Class employees if deemed necessary to protect the actuarial soundness of the Fund. Indeed, if

a large number of special class employees was involved, Article II, section 1, authorized the Trustees to refuse to accept the group if, in the exercise of their proper discretion, the Trustees decided that acceptance would "impair the actuarial soundness of the Fund." But after the Trustees' acceptance of the Special Classes into the Fund, Article II, section 1, neither expressly nor impliedly authorized the Trustees to retroactively impose "special rules" or "new rules" on the Special Classes.

Taking another tack, the Trustees argue that it was proper to not cancel the past service credit of Precision's I.A.M. employees.

> [They] did not cancel the past service credit of I.A.M. participants in the plan since it was likely that these participants would be reemployed by other contributing employers to the plan, and further contributions could therefore be expected.

Stating that these actions "took into consideration the differing characteristics between the special class employees and the I.A.M. employees," the Trustees argue that their actions have a rational basis related to a proper purpose of the Plan and are neither arbitrary, capricious nor discriminatory.[11]

It is true that William W. Winpisinger, who at the time was a general vice president and president elect of I.A.M., testified:

> [I]n the I.A.M. jurisdiction it is a genuine rarity to find someone who has worked for only one [covered employer]. I would go further again in generalizing and say to you that the odds of an I.A.M. member having worked for more than one are a lot greater than for a non-I.A.M. member [special class employees], to distinguish between the two groups.
> The likelihood of special class people working for more than one covered employer is very, very remote.

The probative force of this testimony weakens in view of other testimony of Winpi-

singer. He reveals that only slightly over ten percent of the total membership of I.A.M. participate in Benefit Plan A, and that Contributing Employers are roughly but one out of five employers of I.A.M. members.[12] With only ten to eleven percent of all I.A.M. represented employees working in I.A.M. pension-covered employment, the probability of the accuracy of plaintiffs' claim of reemployment of terminated I.A.M. employees in covered employment is not shown.

Moreover, it is disclosed that neither the Fund, nor its actuaries and consultants, have studied the incidence of reemployment of participants with second or subsequent Contributing Employers. Thus, government counsel correctly notes, "[the] 'distinction' from which the Trustees derive the 'rational basis' for their action which they contend renders it other than 'arbitrary and capricious' is based at best on assumptions and surmises by the Trustees."

### B.

The Trustees state that the amendment was adopted in June, 1975,

> upon the basis of actuarial data available and after it had been demonstrated that there was a potential unfunded liability of over 2½ million dollars resulting from the closing of the Cleveland plant on July 12, 1974. The amendment was an appropriate response to the situation and clearly within the power of the trustees under the plan documents.

At another point, Trustees argue:

> Faced with a difficult problem created by the large unfunded liability and threat to the actuarial soundness of the fund, the trustees acted so as to protect the fund. Their decision had a rational basis related to a proper purpose of the fund and therefore could not be arbitrary and capricious in the circumstances.

---

11. As previously determined in Part I, the pre-ERISA "rational nexus" test is superceded by the fiduciary duty requirements of 404(a)(1) of Title I of ERISA.

12. There are 2,500 Contributing Employers compared to 12,000 employers who have entered collective bargaining agreements.

The undisputed facts do not support plaintiff's pivotal position that the $2.6 million unfunded liability of the vested pension rights of Precision's Special Classes threatened the actuarial soundness of the Fund. First, the $2.6 million unfunded liability needs to be placed in context. The "Actuarial Evaluation" dated May 29, 1974, prepared by the Fund's actuaries indicates a total accrued liability of $436,177,500 of which $340,019,900 is unfunded liability. Thus the $2.6 million unfunded liability of Precision's Special Class employees accounted on May 29, 1974 for less than one percent of this total unfunded liability. It is not surprising therefore that neither Segal's senior vice president Sheinkman nor its senior vice president and chief actuary Elkin testified that he had ever advised plaintiffs that paying the projected deficiency would have threatened the actuarial soundness of the fund.[13]

Even more pertinent is the fact that the record discloses that the Trustees did not consider the question of actuarial soundness in deciding to adopt the amendment. Trustee Thompson, an employers' representative, was asked:

Had the actuaries by the time of that meeting reached the conclusion that the amendment was necessary for the actuarial soundness of the plan?

Mr. Thompson answered:

I don't think that the question of actuarial soundness arose. $2 million is always a big bump. To say that a $2 million obligation in x number of years is going to destroy a $200 million fund. No. I don't think it could make the fund actuarially unsound, in my judgment. . . .

In their reply brief, plaintiffs scale down the position taken in their first brief that they "acted so as to protect the fund." Rather, the reply brief states, "It is also incorrect to say that 'Actuarial soundness' is unaffected by the withdrawal of this large group of employees." The underlying testimony on this point was general and not related to the Precision case.

Asked whether employer withdrawals or terminations affect the actuarial soundness of the Fund, chief actuary Elkin answered:

Every event affects the actuarial balance to a greater or lesser degree. When an employer leaves, we are deprived of the contributions that will be received on behalf of these employees. When an employer leaves we are left with a number of pensions that came from that employer. Sometimes all of this is an intangible. It is hard to pin down. The fact that an employer is leaving may have known before hand and may have induced a number of people to hasten their retirement and get on the pension rolls. We seldom know about these things. But no sparrow falls any place without having an impact. It is a question of size. And the departure of an employer does have some effect on our next actuarial evaluation.

While the retention of an unfunded liability of $2.6 million is a sizeable event and although chief actuary Elkin indicated that an actuarial event is a "question of size," when asked if he "recommended to the Fund [that] it would be a good idea to get rid of this Precision casting group because that would help us solve the actuarial problem," he answered, "We never make recommendations of that sort, no."

Trustees argue that in a multi-employer fund:

It is assumed that the on-going contributions of each contributing employer will ultimately amortize the unfunded liability of the Fund with respect to the covered employees of that employer who have become eligible for pensions based in part upon past service credit.

---

13. Sheinkman p. 29 of deposition:
Q: Did you at any time advise the trustees that the Precision shut down made the plan actuarially unsound?
A: No
Q: To your knowledge did Mr. Elkin so advise the trustees?
A: No

Elkin deposition, p. 5:
Q: Did you ever advise the trustees of this plan that for the actuarial soundness of the plan, they should cancel the past service credit of those special class participants?
A: No.
Q: Were you ever asked for such an opinion?
A: No.

This argument is not supported by Elkin's testimony. Chief actuary Elkin stressed the "pooling of risks" that exists "when employers enter into a multi-employer pension fund at the outset." He further testified:

> [W]e assume that these employers or this sea of employees will continue. Perhaps one employer will go out of business and the employees will be picked up by another, perhaps not, but if this sea of employees continues and the employers pool their risks, we will be able to support the benefits that this level of contributions that has been negotiated provides.

Describing their dilemma, plaintiff-trustees argue:

> They could, on one hand, have accepted the $2,500,000 unfunded liability for the Precision special classes, and hope to remedy this deficit through future contributions of other employers of the special class members. However, this presents a practical impossibility because the trustees have no control over the rates of contribution set in collective bargaining agreements. . . .

With the premise unproved that the unfunded liability of $2.6 million threatened the actuarial soundness of the Plan, the professed belief of the Trustees does not necessarily follow that if they did not "limit liability of the Fund with respect to the special classes," they would be required "to remedy the $2.6 million deficit through future contributions of other employers."[14] Indeed, assuming that drastic action might become necessary at some time, Trustees had another choice. Article X, section 2 of the Plan authorizes the Trustees to amend the Plan "so as to change the benefit amounts" prospectively. Article X, section 2 only forbids reduction of "any pension

benefits which have been approved for payment prior to amendment, so long as funds are available for payment of such benefits." Thus the Trustees, if the Fund was in serious fiscal jeopardy, might have reduced the amount of future benefits for all participants.

The Trustees argue that "imposing the burden of [the unfunded liability of the Precision Special Classes] on all the other covered employees in the fund" would be "unfair to the covered employees of other contributing employers." This fairness argument is selective. The Trustees' owed a duty of fairness to all—not just some of the covered employees. Under the Plan, they were required to exercise their discretion in a non-discriminatory manner; and under ERISA they were required to conform to the Plan without preferences amongst either participants or beneficiaries.

The statement of the D.C. Circuit in *Norton v. I.A.M. National Pension Fund, supra,* that "forfeiture of past service credit might be necessary in some circumstances to protect the fund," *Id.* 180 U.S.App.D.C. at 182, 553 F.2d at 1358, does not dictate any different conclusion. However, if the Trustees choose to "protect the fund" through a forfeiture of past service credits, the forfeiture must fall evenly on all participants in the Fund. To do otherwise would violate section 1104(a)(1) by virtue of not being an action of the Trustees that is "solely in the interests of the participants and beneficiaries."

### IV.

The remaining issue may be styled *Plaintiff-Trustees v. Aurora Corp. and the Fayetteville Special Class.* Some exposition is essential.

---

14. Chief actuary Elkin testified that the Fund's total annual employer contributions are projected at over $45 million and the total costs at $43.2 million—a differential of $1.8 million. The $43 million cost item is a combination of "the amortization payment on that unfunded past service liability [presumably $340,019,900] plus the normal costs constitutes this $43 million." He further testified that "The elimination of two and a half million dollars from the [unfunded past service] liability reduces the funding requirements, the so-called actuarial cost, by approximately six percent of that amount, about $150,000." Spreading this projected annual cost of $150,000 (needed to amortize the $2.6 million unfunded liability over 40 years) over the "sea" of 75,000 employees results in an annual impact of less than $2.00 a year for each participant in the Fund.

Following the closing of the Precision plant in Cleveland on July 12, 1974, Aurora continued to contribute to the Fund for the non-union Special Class plan participants who continued to work at the Fayetteville plant. Aurora paid, or offered to pay, these monthly contributions until it sold the Fayetteville, New York plant in October, 1976. Thereafter the purchasing corporation no longer tendered any contributions to the Fund.

Plaintiff-trustees seek a declaration from this court that they are not obligated to accept the contributions tendered on behalf of the Fayetteville class after the termination of the collective bargaining agreement between the I.A.M. Cleveland local and Aurora—May 31, 1974. The Trustees contend that the Plan's provisions require them to accept such Fayetteville Special Class contributions only so long as Aurora was obligated to contribute to the Fund by virtue of the collective bargaining agreement between Aurora and the local I.A.M. lodge.

By letter of November 7, 1974, the plaintiff-trustees refused to accept further contributions from Aurora on behalf of the Fayetteville Special Class and thereafter returned to Aurora the contributions made on behalf of said members for hours worked subsequent to June 30, 1974.

As seen, the collective bargaining agreement with the local lodge of I.A.M. that covered the approximately eighteen I.A.M. members who worked at Precision's Cleveland plant expired on May 31, 1974. However, Aurora Corporation had a collective bargaining agreement with a different I.A.M. lodge at its Rockford, Illinois plant.

Aurora and the Fayetteville Special Class insist that plaintiff-trustees were bound to accept contributions for the Fayetteville Special Class, inasmuch as Aurora had a collective bargaining agreement with I.A.M. covering some employees at the Aurora plant in Rockford, Illinois. They rely on Article II, section 8h which provides for the acceptance of Special Class employees upon the condition that:

> The employer agrees in writing to continue contributions for such employees so long as he has any other employees for whom he is obligated to contribute to the Fund in accordance with a Collective Bargaining Agreement with a Participating Lodge.

The Fayetteville Special Class argues that this condition was met since "Precision [actually Aurora] continued to have other employees (at Rockford) for whom it was obligated pursuant to an I.A.M. agreement to contribute to the fund." In addition, Article II, section 8j provides:

> Employees of a Contributing Employer who are employed at a place of business other than the place of business covered by the Collective Bargaining Agreement with the Participating Lodge may be included as members of a special class of the Contributing Employer.

Finally, it is argued that the basis for termination under Article IX, section 2 of the Plan was never met since "Precision [Aurora] continued to be obligated by the Rockford agreement." [15]

■ These various provisions of the Plan, upon which Aurora and the Fayetteville Special Class rely, plausibly support their reading of those provisions. However, the Plan, standing alone, does not create the vested rights of the Special Class which this court has recognized. The Plan must be read together with the "Participation Agreement—Special Classes of Employees" executed by Precision Castings Division of Aurora Corporation of Illinois on April 11, 1972. Without Aurora's voluntary entry into this last Participation Agreement, the future service credits of the Special Classes would have ended with the expiration of the preceding Participation Agreement—on or before March 1, 1972. The Participation Agreement's paragraph 2 provides (in language that is essentially identical to Article II, section 8h, of the Plan) that:

> (a) When the employer is no longer obligated by a Collective Bargaining Agreement to make contributions to the Fund on the basis required by the Trustees; or. . . .

---

15. Article IX, section 2 as follows:

The participation of a contributing employer shall terminate:

The undersigned Employer further agrees that contributions for the Special Classes of Employees shall continue so long as it has any other employees for whom it is obligated to contribute to the Pension Fund in accordance with a collective bargaining agreement [with] a Lodge . . . [of the I.A.M.].

This paragraph must be read in conjunction with the opening paragraph of the agreement which explicitly premises the Participation Agreement upon Aurora being a Contributing Employer for the Cleveland lodge of the I.A.M.:[16]

The undersigned Employer is a Contributing Employer to the I.A.M. Labor-Management Pension Fund with respect to its employees represented for collective bargaining purposes by Lodge No. 1825 of Distict Lodge No. 54 of the . . . [I.A.M.].

Read in its entirety, the Participation Agreement covering non-I.A.M. persons in Cleveland and Fayetteville, had a termination date that coincided with the expiration of the I.A.M. local agreement at Precision, i. e., May 31, 1974. The Rockford I.A.M. agreement did not extend the life of the Participation Agreement because the agreement covering the Fayetteville Special Class employees was never, at any time or in any way, dependent upon or connected with the unrelated Rockford, Illinois, Aurora–I.A.M. agreement. Because the Participation Agreement did not extend beyond the expiration of the I.A.M. local Agreement in Cleveland, the Fund was within its rights in refusing to accept the contributions tendered by Aurora on behalf of Special Class employees as a result of their employment with Aurora after June 30, 1974. Indeed, the Fund could have refused the tender of all contributions based upon employee service after the May 31, 1974 expiration of the Cleveland collective bargaining agreement.

In so construing the Precision Participation Agreement, the Trustees acted within their powers to interpret that agreement; and the specific language of that agreement relating to Precision necessarily controlled the more general language of Article II, section 8h and section 8j. Hence, the Trustees' interpretation of the Participation Agreement to allow them to refuse to receive further contributions to the Fund from Aurora for services of Special Class employees subsequent to June 30, 1974, was reasonable and within their powers.

V.

In sum, this court declares invalid subsection (k) of Article II, section 8, insofar as it is applied retroactively to cancel the past service credit of Precision's two Special Classes. Further, this court declares valid the Trustees' refusal to accept from Aurora contributions to the Fund covering the special classes for service subsequent to June 30, 1974.

Subsequent orders concerning designation of class members and individual vesting rights, and fixing reasonable attorney fees for attorneys for the Special Classes will be entered either pursuant to agreement or taking of evidence if necessary. Counsel are directed to meet in Cleveland on March 6, 1978, if mutually convenient, and report to the court. Thereafter an appropriate final order incorporating the orders herein made and hereafter to be made shall be entered.

16. The "Participation Agreement—Special Classes of Employees (non-I.A.M. Union)" of April 11, 1972 which provided for the Federal Labor Union employees at the Cleveland plant to become a Special Class within the Fund was also premised upon the existence of a collective bargaining agreement between Lodge No. 1825 of the District Lodge No. 54 of the I.A.M.