Martin FINE, Bernard Jacobson and Irwin Block, etc., Plaintiffs,

v.

Barry N. SEMET, Defendant.

No. 79–5240–Civ.–CA.

United States District Court, S. D. Florida.

Feb. 2, 1981.

Lawrence Metsch, Miami, Fla., for plaintiffs.

Jay Schwartz, Miami, Fla., Rudolph Cecchi, South Miami, Fla., for defendant.

## MEMORANDUM OPINION

ATKINS, District Judge.

The cause came before the Court for a non-jury trial on October 6 through 7, 1980. In addition to exhibits and the testimony adduced at trial, the Court has reviewed the deposition of Sally Giles, taken May 30, 1980. Plaintiffs seek a declaratory judgment confirming the validity of the decision

not to make immediate payment of pension and profit sharing plan benefits to defendant following termination of his employment with the law firm. Defendant has counterclaimed to recover such lump sum benefits and the parties have submitted post-trial briefing. By separate order, I have resolved the issue of whether the testimony of Brown and Paul will be considered as evidence. This memorandum opinion is based on my consideration of the record and incorporates my findings of fact and conclusions of law as required by Rule 52(a), Fed. R.Civ.P.

## FACTUAL BACKGROUND

The plaintiffs, Martin Fine, Bernard Jacobson and Irwin J. Block, are stockholders in the law firm of Fine Jacobson Block Klein Colan & Simon, P. A., formerly known as Fine Jacobson Block Goldberg & Semet, P. A. (hereinafter referred to as "the Firm"). The plaintiffs are also trustees of the Pension and Profit Sharing Plans of Fine Jacobson Block Goldberg & Semet, P. A. (hereinafter referred to as "the Plans"). Defendant, Barry N. Semet, is a former stockholder and employee of the Firm. While employed with the Firm, he was a trustee for and participated in the Plans.

The Firm was formed as a professional association in 1971. The Plans were created at the same time as the formation of the Firm with plaintiffs and defendant serving as signatories of the Plans and of the First Amendments executed in 1977. The individual plaintiffs and the defendant were appointed Trustees under the Plans which cover all employees of the Firm.

On March 2, 1979, defendant Semet terminated his employment with the Firm and became a partner in the law firm of Finley Kumble Wagner Heine & Underberg in Miami, Florida. Following his termination, on October 15, 1979, defendant made a written request to the Trustees of the Plans seeking immediate payment in lump sums of his accrued benefits under the Plans. These benefits amounted to approximately $48,-584.87. In November, 1979 defendant was informed in writing that his request had been denied. This lawsuit was instituted on November 7, 1979 by the plaintiffs for a declaration of their legal obligations under the Plans concerning the defendant's demand for immediate lump sum payment of his accrued benefits.

On December 21, 1979, following commencement of this action, the defendant submitted a letter of appeal to the plaintiffs-trustees, again requesting the immediate lump sum payment of benefits. It is the contention of plaintiffs that the appeal was denied in January, 1980 although no copy of such denial has been introduced at trial. Although there is some dispute as to the existence of a written denial, it is apparent to the Court that plaintiffs in fact made the decision to deny such appeal.

The Pension Plan and the Profit Sharing Plan contain identical provisions, designated 5.03, relating to "Termination of Service Prior to Normal Retirement Age." In pertinent part, Section 5.03 of each Plan provides:

Upon termination of a Participant's employment prior to attaining Normal Retirement Age (for any reason other than death or disability), a Participant may elect, *upon the consent of the Advisory Committee*, to direct the Trustee to commence payment to the Participant of his Nonforfeitable Accrued Benefit prior to the Participant's attaining Normal Retirement Age. The Advisory Committee must give its direction to the Trustee on or before the last day of the Plan Year in which the Participant first incurs a Break in Service as a result of the termination of his employment.... If the terminating Participant is one hundred percent (100%) vested in his Accrued Benefit by the close of the Plan Year in which his employment terminates, *the Advisory Committee, in its sole discretion*, may direct the Trustee to commence payment to the Participant of his Accrued Benefit within sixty (60) days after the close of the Plan Year in which the Participant's employment terminates without regard to the Participant's incurring a Break in Service....

If the Advisory Committee does not give the Trustee a direction to commence payment, the Trustee shall continue to hold the Participant's Accrued Benefit in trust until the close of the Plan Year in which the Participant attains Normal Retirement Age. At that time, the Trustee shall commence payment of the Participant's Nonforfeitable Accrued Benefit in accord with the provisions of Article VI. . . .

If the Participant terminates employment prior to attaining Normal Retirement Age because of death or disability, the Advisory Committee shall direct the Trustee to commence payment of the Participant's Accrued Benefit to him (or to his Beneficiary if the Participant is deceased), in accord with the provisions of Section 6.02, within sixty (60) days after the close of the Plan Year in which the Participant's employment terminates. [Deleted portions relate to date payment is to be made if directed by Advisory Committee, calculation of benefits at the close of a plan year, and alternative provisions for payment of benefits in case of death or disability]. (Emphasis added).

Although Sections 5.03 refer to an Advisory Committee, it is clear that no formal committee existed or functioned prior to Semet's termination with the Firm. Defendant served as the "administrative partner" of the Firm, handling personnel questions, purchasing of equipment, expansion and other administrative matters. Plaintiffs have characterized defendant as "responsible for the day-to-day administration of the Firm and the Plans." Defendant, however, argues that although he was primarily responsible for day-to-day ministerial functions, he nonetheless consulted with the plaintiffs on all policy matters relating to the Plans. Defendant testified that in 1976 a management committee was formed which took over policy matters relating to the Plans and the Firm in general. The committee was composed of the four senior members of the firm (plaintiffs and defendant) and two non-trustee members. Testimony at trial indicated that as to the Plans, the management committee's primary interest related to investment of the funds' assets. The testimony does not indicate the management committee served as the Advisory Committee described in Sections 5.03 of the Plans.

It is the finding of the Court that defendant made the initial decisions on both ministerial and policy matters relating to the Plans, and then conferred briefly with the other plaintiffs, often on an individual and informal basis. The plaintiffs' primary concerns related to their desire to increase the profitability of the plan's investments, perhaps using real estate investments rather than the certificates of deposits used throughout the 1971–1979 period. There was no showing that the plaintiff-trustees disapproved or overruled defendant's actions prior to 1979. It is the Court's finding that actions taken on behalf of the Firm with respect to investments and lump sum benefit payment decisions were the result of decisions made by defendant, such decision-making authority having been authorized by plaintiffs. In essence, Semet served as a one-man Advisory Committee.

Between 1971 and March, 1979, several employees left the firm prior to retirement age and were granted their requests for immediate payment of lump sum accrued benefits. Indeed, the parties stipulated in their pretrial agreement that prior to the denial of defendant's request of October 15, 1979, payment of accrued benefits under the Plans had not been denied to any terminating employee of the Firm who requested immediate payment of such accrued benefits. The testimony indicates that departing employees would contact either the bookkeeper or defendant with their request for immediate payment, such payment being received approximately one to two months after termination. It was defendant's belief that this immediate payment was expected by the employees and was the better policy to foster good relations with departing employees. On at least one occasion an employee experienced some delay or confusion relating to her request for immediate payment and went directly to defendant and was assured such payment would

be made. She received the benefits checks a few weeks later. *See* Deposition of Sally Giles at 14. In the fall of 1978, another departing employee, Mary Azar, requested deferred payment of her benefits to avoid adverse tax consequences in the tax year of her departure. This request was granted following discussion among the plaintiffs and defendant of the Firm's ability to defer payment. The amounts of lump sum payments made range from a low of a few hundred dollars to a high of approximately $5000.00 in late 1978 or early 1979 to Mary Azar.

Semet testified that he deferred formal request for his accrued benefits for more than six months after his departure in an attempt to allow animosity to dissipate. Semet's departure, as well as that of at least two other attorneys, followed the decision of the Firm as a whole not to merge with the law firm of Finley Kumble Wagner Heine & Underberg. The separation of Semet from the Firm generated extremely hard feelings and bitterness. Collateral disputes in state court between Semet and the Firm relate to distribution of monies under the Stockholders Agreement and resolution of the defendant's ownership interest in the Firm's office building. It was Semet's testimony that the refusal of the plaintiffs' Firm to pay the lump sum accrued benefits required him to borrow the funds needed for his partnership investment with the Finley Kumble firm.

In denying defendant's October 15, 1979 request, Bernard Jacobson signed a letter on behalf of himself, Irwin Block and Martin Fine, stating, "The Advisory Committee determined that it would not be in the best interest of the Plans to make distribution at this time. If your demand was complied with it would create a problem in making investment decisions for the funds held pursuant to the Plans and would cause a financial loss to the other participants...." (Plaintiff's Exhibit 5). Bernard Jacobson testified that the Advisory Committee was composed of himself, Fine and Block, who met to discuss the policy of paying vested benefits to departing participants prior to normal retirement age. Jacobson testified

that the meeting was triggered by Semet's request, that no meeting occurred prior to that date because there had been no need for such a meeting.

Jacobson testified that the reasons set forth in his letter of November 5, 1979 accurately reflected the basis of the Advisory Committee's decision. In contrast, however, it is defendant's contention that the reasons given are a mere sham, that nonpayment is being used as a wedge to force him to accept a lower price for his stock and ownership interest in the office building. Defendant further contends that denial of an immediate lump sum payment is arbitrary, in conflict with the employees' expectations based on prior payments made to departing employees.

In support of his characterization of the actions of plaintiffs, defendant testified that during a settlement conference or conferences in October, 1979 arising out of the state court action, counsel for plaintiffs, Mr. Paul, referred to the issue of defendant's right to receive lump sum Plan benefits as "leverage" in settlement of the other asset disputes. Semet testified that plaintiffs Jacobson and Block were present during the reference and that his own reaction was one of fury. Semet stated that he reminded them that the question of his money under the Plans had nothing to do with settlement of the stock and office building disputes.

Jacobson testified that he never heard Paul refer to the pension funds as leverage. He acknowledged that in the spring of 1979 during discussions with Semet the subject of the Plan assets was raised and that he responded it would have to be considered together with the building and stock questions at an appropriate, later time.

As set forth in a separate order relating to the admissibility of Brown's testimony at trial, Morton Brown, defendant's legal representative during state settlement conferences, testified that Paul's opening remarks connected the issue of distribution of Pension and Profit-Sharing monies to settlement of the stock purchase and building issues. Brown testified that Paul used the

word "leverage" in connection with settlement, and made a statement to the effect that once we resolve the issue of the purchase of the professional association, the other issues will fall in line.

Paul testified that the reference to leveraging was made by defendant or his counsel who accused plaintiffs of improperly using the pension funds issue as leverage. Paul testified that during his representation of plaintiffs at the settlement conferences defendant several times stated that no settlement would be reached without payment of the Plan funds.

Despite these conflicting versions which serve to align defendant with his counsel, Mr. Brown, against plaintiffs and their counsel, Mr. Paul, a pattern of consistent behavior is revealed. I find that defendant Semet had initiated his state court actions relative to payment for his shares and interest in the building prior to formally requesting lump sum payment of accrued benefits under the Plans. Entering into the October 1979 settlement discussions urged by the state court, defendant and his counsel were alert to any attempt to link defendant's new request to the valid settlement issues. I find that when Paul opened the discussion with references to the Plan benefits as "one of three" issues, defendant and his counsel reached the premature conclusion that improper leverage was being attempted. At a very early stage of the conferences, the hope for effective communication was destroyed. The failure on the part of both parties and their counsel to conduct the settlement discussions in a professional manner, free from the emotional overtones generated by the splitoff of former partners, contributed to further confusion of the Plan benefits issue with the issues of the building and share settlement. It is apparent to the Court that although defendant had a sincerely held perception that improper "leveraging" was being applied by plaintiffs, plaintiffs were equally disturbed by the implication that without immediate distribution of Plan benefits, no general settlement would be agreed to by defendant. Despite defendant and his counsel's testimony, I find no persuasive support exists for the allegation that improper leveraging was intended or attempted.

Defendant's position throughout the period subsequent to his departure, reflects his belief in an absolute entitlement to immediate payment of accrued benefits under the Plans, despite the discretionary language of Sections 5.03 of the Plans. His position is summarized by his own words in his letter of appeal to the Firm trustees, dated December 21, 1979:

> The denial of the requested benefits was illegal and improper and this notice of appeal is based on, among other things, the following:
>
> 1. The denial did not cite specific reasons therefor.
>
> 2. The denial is contrary to the provisions of the Plans.
>
> 3. The cited Section for denial, 5.03, does not constitute a basis for the action taken.
>
> 4. The denial is contrary to applicable provisions of the Internal Revenue Code and the Employee Retirement Income Security Act of 1974.
>
> 5. The denial was improper in that it did not identify the members of the purported Advisory Committee or the name or address of the member thereof to whom any appeal should be forwarded.
>
> 6. In filing this appeal, I am not waiving the fact that the alleged Advisory Committees are in fact shams which have never existed, do not exist now and are being used solely to delay payment of benefits to which I am entitled.

Defendant's Exhibit 7.

As reflected by defendant's Exhibit 19, prepared in November of 1979, defendant's total accrued benefits under the Plans as of May 31, 1979 amounted to approximately $48,584.87. The assets available in the Plans on the same date totalled approximately $340,000.00.

## THE APPLICABLE LAW

It is undisputed that federal jurisdiction is validly based on 29 U.S.C. § 1132. Congress enacted the Employee Retirement Income Security Program [hereafter "ERISA"] at 29 U.S.C. §§ 1101–1381, to increase the number of individuals in employer-financed benefit plans and to protect employees' rights to receive benefits. ERISA is fairly characterized as a pro-employee act, designed to provide safeguards with respect to the establishment, operation and administration of the Plans. Section 1132 permits civil enforcement by a private participant or beneficiary.

ERISA provides that "the assets of the plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to the participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan." 29 U.S.C. § 1103(c)(1). The persons in charge of the profit and pension plans have a statutory fiduciary duty to uphold the purpose of the plan. 29 U.S.C. § 1104. In discharging this duty, a fiduciary *shall not*:

(1) *deal with the assets of the plan in his own interest or for his own account,*

(2) *in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or*

(3) *receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.*

29 U.S.C. § 1106(b).

If a breach of this fiduciary duty occurs, personal liability incurs. 29 U.S.C. § 1109. Plaintiffs contend that their decision not to provide a lump sum payment of pension and profit-sharing benefits to defendant was proper in that (1) the denial was not "arbitrary and capricious" under the guidelines of ERISA and applicable case law, (2) the denial was not barred by the principle of "equitable estoppel" as set forth in *Minerals & Chemicals Philipp Corp. v. Milwhite Co.*, 414 F.2d 428 (5th Cir. 1969), and (3) no breach of the statutorily defined fiduciary duty has occurred.

As set forth in his answer and counterclaim, defendant argues that the denial was an improper attempt to exert leverage over the defendant in reaching a settlement of his state court action and that such action constitutes self-dealing in violation of the trustees' fiduciary duty. Alternatively, defendant asserts plaintiffs are estopped to deny his request because of the law firm's prior record of never having denied a lump sum payment request. He contends that any "Advisory Committee" is a mere sham.

## THE TRUSTEES' FIDUCIARY DUTY

Defendant's separation from the Firm was voluntary and it is clear that he has not attained the statutory normal retirement age. Thus, under 29 U.S.C. § 1056(a), the *latest* date on which benefits must be paid is the 60th day after the close of the Plan year in which the participant attains age 65 or an earlier "normal retirement age," as defined under the Plan. In seeking to protect a participant's entitlement to benefits, Congress set age 65 or a plan-defined "normal retirement age" as the outside deadline for payment. In this manner, Congress left the employer free to set an earlier date or to provide lump sum payments following termination of employment. While the statute does not require trustees to pay benefits prior to normal retirement age, it does not specifically preclude payment of benefits prior to that date. Section 5.03 of the instant Plans, and the discretion they accord the Advisory Committee to make immediate payment of benefits, are consistent with Section 1056(a) of ERISA. *See also Denzer v. Purofied Down Products Corp. Profit-Sharing & Retirement Plan*, 474 F.Supp. 773, 775 (S.D.N.Y.1979); *Riley v. MEBA Pension Trust*, 452 F.Supp. 117 (S.D.N.Y.1978), *aff'd. on other grounds*, 586 F.2d 968 (2d Cir. 1978). Thus, having determined that Sections 5.03

are consistent with ERISA's statutory purpose, the question is whether the trustees in the instant case abused the discretion accorded them under these sections, or otherwise violated their fiduciary duties under the Act.

The Court had requested briefing both as to the applicable standard for review of plaintiffs' actions as fiduciaries, and as to what party bears the burden of proof. Review of the briefing reveals some confusion of these separate issues, both on the part of various courts and the parties herein.

Defendant contends plaintiffs have the burden of proving the propriety of their actions, citing *Marshall v. Snyder*, 572 F.2d 894, 900 (2d Cir. 1978). In this enforcement action initiated by the Secretary of Labor against certain trustees of employee benefit plans for a union, the Second Circuit stated that "it would be new law to find that in a self-dealing transaction . . . the party [here, the Secretary of Labor] representing the beneficiaries of the fiduciary whose self-dealing transaction is challenged must prove the unfairness of the transaction." Citing cases, the Court concluded "[t]he settled law is that in such situations the burden of proof is always on the party to the self-dealing transaction to justify its fairness." *Id.* at 900. In contrast, plaintiffs cite *Bayles v. Central States, Southeast & Southwest Areas Pension Fund*, 602 F.2d 97 (5th Cir. 1979) for the proposition that defendant-beneficiary bears the burden of proving plaintiff-trustees acted arbitrarily and capriciously. Therein, it is stated that "[a]ccording to the clear weight of federal authority, the actions of the trustees in the administration of the pension plan must be sustained as a matter of law unless plaintiff can prove such activities have been arbitrary and capricious." *Id.* at 99. Resolution of this seeming contradiction as to the appropriate burden of proof is possible through review of the authorities supporting each circuit's statement. It then becomes clear that the Fifth Circuit in *Bayles* was concerned not with allocating the burden of proof, but in setting forth the standard of "arbitrary and capricious" by which the Court is guided in analyzing the propri-

ety of the trustee's actions. For instance, in the cited case of *Bueneman v. Central States, Southeast & Southwest Areas Pension Fund*, 572 F.2d 1208 (8th Cir. 1978), the discussion centers entirely on whether judicial review of the trustees' action is limited to determining whether such action has been arbitrary and capricious or an abuse of discretion, resolving the question in the affirmative. Review of the principal authority cited in *Marshall v. Snyder*, gives greater insight into plaintiffs' burden at trial:

> The pensioners established that the Union Trustees, in illegal domination of the Fund, were in a position of conflicting loyalties, and that in that position they pursued a policy which prima facie benefitted one group to the detriment of another. At that point the burden of explanation or justification should properly have shifted to the fiduciaries. Instead the Court [incorrectly] charged the pensioners with the failure to prove an evil intention.

*Nedd v. United Mine Workers of America*, 556 F.2d 190, 210–211 (3rd Cir. 1977) (footnotes omitted). *See also, Pepper v. Litton*, 308 U.S. 295, 306–307, 60 S.Ct. 238, 245–246, 84 L.Ed. 281 (1939) (where a transaction is challenged as improper, the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein).

 Accordingly, defendant Semet having alleged and shown a denial by plaintiffs of his request for immediate payment of accrued benefits which was facially inconsistent with payments made to all prior departing Plan participants, I find that the burden shifts to plaintiffs to justify their actions as consistent with their fiduciary duty under ERISA. *See also Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 636 (W.D.Wis.1979) (Once a plaintiff proves a failure by trustees to diversify investments under 29 U.S.C. § 1104(a)(1)(C), burden shifts to the defendant to demonstrate that nondiversification was prudent under the circumstances). I do not find this shift-

ing burden inconsistent with the Fifth Circuit's recognition that trustees of pension trusts are generally granted broad discretion requiring courts to "limit their review and intervene in the fiduciaries' decisions only where 'they have acted arbitrarily or capriciously towards one of the persons to whom their trust obligations run.'" *Bayles v. Central States, supra* at 100. Thus while the standard of judicial review is "arbitrary and capricious," the burden of proof has now shifted to plaintiff's trustees to justify their action in denying defendant's request.

■ I am satisfied that the Advisory Committee referred to in the denial letter of November, 1979 was not a mere sham. Semet's departure forced the remaining trustees to meet and review his request for immediate payment. It is my conclusion that their decision to refuse to exercise their discretion to make immediate payment of Semet's accrued benefits was not arbitrary or capricious but was supported by their valid concern that immediate payment of more than $48,000.00 of the Plans' approximately $340,000.00 in assets would create a "problem in making investment decisions" and could cause a "financial loss to the other participants." Plaintiffs' Exhibit 9. In reaching this decision, plaintiffs were entitled to compare the total benefits requested to the relatively minimal amounts paid to previous, departing employees. They were entitled to take into consideration the combined effect of Semet's request, and requests by the several other persons who left with Semet, on the Plans' total assets. While relatively small lump sum payments over a course of years are unlikely to impact adversely on investment decisions or profitability, the same cannot be said of a sudden loss of some 14% of the Plans, combined with the significant potential for additional requests for immediate payments which are substantial in total.

■ Nor do I find plaintiffs' action arbitrary or unreasonable in light of the purpose of ERISA. Analysis of the ERISA provision as a whole and review of the legislative history contained at [1974] U.S. Code Cong. & Ad.News 4639–5190 reveals Congressional desire to protect employees' rights to vested benefits, to guard against arbitrary forfeitures, and to promote sound asset management through avoidance of irresponsible or self-dealing investment decisions. The statute is aimed at promoting and securing for employees their expectations of retirement funds. I am persuaded that a policy of mandatory lump-sum payments, regardless of their amount or impact on the total plan assets, is inconsistent with the Congressional purpose and corresponding duty to protect the total plan funds for retirement, death or disability compensation. Defendant's characterization of the Firm's Plans as primarily designed to defer taxable compensation in a manner approved by the Internal Revenue Service is at odds with the clearly expressed purpose behind enactment of ERISA. See also defendant's exhibits 1 and 2, Pension and Profit Sharing Plans, acknowledging the purpose to provide "retirement benefits to eligible Employees." In summary, the plans created under ERISA permit deferred compensation and the associated tax benefits, but do so with the goal of protecting employees' expectations in receiving retirement funds.

■ Defendant appears to contend that because the plaintiff-trustees are also major participants in and eventual beneficiaries of the Plans, their refusal to make a lump sum payment prior to retirement age inures only to their benefit, thus comprising the sort of self-dealing by fiduciaries prohibited under ERISA. This rationale is unpersuasive, for its acceptance would logically prohibit all major participants from serving as trustees since any action to increase the profitability of plan assets could be construed as self-dealing. Although Congress was explicit in its prohibition on employer self-dealing, 29 U.S.C. § 1103(c)(1), it did not prohibit persons in the plaintiffs' posture from serving both as trustees and beneficiaries. 29 U.S.C. § 1108(c)(1) ("Nothing in Section 1106...shall be construed to prohibit any fiduciary from... receiving any benefit to which he may be entitled as a participant or beneficiary in the plan...."). It is suffi-

cient that actions taken by trustee/participants serve to protect the rights of all participants and beneficiaries to benefits under the Plans in an even handed manner. I am satisfied that actions taken by trustee/beneficiaries, which are not inconsistent with the interest of all beneficiaries as a group, do not constitute prohibited self-dealing merely because their own assets under the plans are thereby enhanced or protected. *See Shaw v. Kruidenier,* 470 F.Supp. 1375, 1390 (S.D.Iowa 1979); *Hardy v. H.K. Porter Co., Inc.,* 417 F.Supp. 1175, 1181 (E.D.Pa. 1976). *Compare Freund v. Marshall & Ilsley Bank, supra.*

▮ Finally, as discussed at pages 7 and 8 above, I find defendant's contention, that plaintiffs have violated 29 U.S.C. § 1106(b)(1) by attempting to use the Plan benefits as leverage to force a favorable settlement on the building and stock purchase disputes, is without factual merit. It is my determination that the trustees acted within discretion validly accorded them under the Plans, denying the request for immediate payment for reasons not repugnant to the equitable character of ERISA. *See Shaw v. Kruidenier, supra* at 1391.

▮ Defendant urges consideration of plaintiffs' conduct in light of *Winpisinger v. Aurora Corp. of Ill.,* 456 F.Supp. 559 (N.D.Ohio 1978). In this case the district court rejected plaintiff-trustee's request for an order declaring the validity of their retroactive cancellation of past service credits for two classes of employees. To the extent that this opinion at 567 may be construed as holding that the ERISA standard of fiduciary responsibility is different than the "arbitrary and capricious" standard relied on above, I find the analysis to be in conflict with that of the Fifth Circuit in *Bayles, supra.* Although the court in *Winpisinger* concludes that the trustees' non-uniform

treatment of one group of employees served to create a prohibited preference for other plan beneficiaries, this does not support defendant's contention that his request for lump sum payment must receive treatment identical to that of prior departing participants. I believe that under ERISA, the concept of invalid preferences depends not merely on a showing of dissimilar treatment, but on dissimilar treatment which is based on an improper purpose *or* irrational effect.* *See e. g. Hardy v. H.K. Porter Co., Inc.,* 417 F.Supp. 1175, 1184 (E.D.Pa.1976); *Hackett v. Pension Benefit Guaranty Corp.,* 486 F.Supp. 1357, 1363 (D.Md.1980). Here the trustees validly premised different treatment on consideration of the greater impact Semet's request would have on the plan assets as a whole. *Compare Winpisinger, supra* at 570 ("Thus it becomes clear that as a condition of accepting [the employees] into the Fund, ... the Trustees ... could have set higher contribution rates ... if deemed necessary to protect the actuarial soundness of the Fund."). Finally, in contrast to the permissible, discretionary language of instant Sections 5.03, the determination in *Winpisinger* that trustees breached their duty under 29 U.S.C. § 1104(a)(1) by cancelling past service credits of certain employees, largely depends on the Court's interpretation of the plan documents as mandating vesting of those employees. *Id.* at 569.

Defendant also relied on *Kulchin v. Spear Box Co., Inc. Retirement Plan,* 451 F.Supp. 306 (S.D.N.Y.1978). On summary judgment and in a subsequent, unpublished order of July 31, 1978, it was ruled that plaintiff, a departing trustee and plan participant, was entitled to immediate distribution of accrued pension benefits. The Court warned that the issue of plaintiff's entitlement to those benefits should not be used as a

---

* In using the words "improper purpose or irrational effect" to describe prohibited dissimilar treatment, I do not mean to imply that defendant is required to show the trustees acted in "bad faith." The Fifth Circuit warns that bad faith is not the appropriate standard under ERISA. *See Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1260 (5th Cir. 1980). I do find,

however, that whatever inferences or presumptions are raised by the defendant's showing of the mere fact of dissimilar treatment have been rebutted by credible evidence offered by plaintiffs showing an absence of improper motive, and valid reasons supporting the different treatment of defendant's request.

"bludgeon" by the employer in separate, state court actions where plaintiff was challenging the circumstances under which his employment was terminated. Although the language used in the *Kulchin* opinions is intriguing, the factual premise precludes its application to the instant case. In *Kulchin*, it was conceded, for reasons not articulated in the opinion, that plaintiff-participant had an absolute entitlement to payment of accrued benefits following termination of his employment. The primary issue, resolved in favor of plaintiff-participant, was whether "termination" had occurred. Although there was an issue as to whether the benefit payments would be in a lump sum or periodic over the space of the next ten years, no argument was made that under Section 1056(a) the participant's entitlement to benefits would not arise until the latest of the three dates articulated in the statute, "the date on which the participant attains the earlier of age 65 or the normal retirement age specified under the plan." Unlike Sections 5.03 herein, it appears that the plans in *Kulchin* had mandated payment at an earlier date. Also unlike the instant case, there were no valid reasons for the trustees' inconsistent treatment of Kulchin's request for immediate benefits.

## ESTOPPEL

Although not extensively briefed in memoranda, defendant contended at trial and in the "Fourth Defense" of his answer, that plaintiff-trustees are estopped to deny his entitlement to immediate payment of benefits in that until defendant's request, all other employees who terminated prior to attaining normal retirement age were paid the lump sum accrued benefits upon request. Defendant cites no cases which specifically address this theory. Plaintiff contends that the elements of estoppel as applied in Florida, have not been satisfied:

The essentials of equitable estoppel are (1) words and admissions, or conduct, acts and acquiescence, or all combined causing another person to believe in the existence of a certain state of things; (2) in which the person so speaking, admitting, acting and acquiescing did so wilfully, culpably,

or negligently, and (3) by which such other person is or may be induced to act so as to change his own previous position injuriously. The parties sought to be estopped must be guilty of conduct which amounts to * * * concealment of material facts at a time when he has knowledge, actual or constructive of the real facts.

*Minerals & Chemicals Phillip Corp. v. Milwhite Co.*, 414 F.2d 428, 430 (5th Cir. 1969), quoting *Aetna Casualty & Surety Co. v. Simpson*, 128 So.2d 420, 425 (Fla.1st D.C.A. 1961).

I find that although all persons who departed the Firm prior to defendant had been paid their accrued benefits, each payment was made as the result of separate decisions by defendant, authorized by actual consent or the actions of plaintiffs. I find it impossible to conclude that the informal basis upon which these requests were handled by defendant could reasonably lead defendant to the conclusion that a Firm policy of immediate payment to all departing employees had been created. More importantly, and assuming for the moment that such a policy was created or inferred by defendant, there is no evidence that defendant changed his position to his detriment in reliance on the perceived policy. Although undoubtedly the money could have been useful to defendant in making his partnership investment in Finley Kumble, there is no showing that defendant relied on anticipated receipt of those benefits in reaching the determination to leave the firm of Fine Jacobson Block Goldberg & Semet. Accordingly, it is my determination that defendant has failed to carry his burden on the theory of equitable estoppel.

## CONCLUSION

For the foregoing reasons, it is ORDERED AND ADJUDGED that judgment be entered in favor of plaintiffs and against defendant.

The parties agreed prior to trial that any allocation of attorneys fees and costs would be presented by post trial memoranda and affidavits. Therefore, the plaintiffs have

ten days from the file date of this Order to file an appropriate motion.

The Clerk of the Court is hereby directed to enter an appropriate final judgment pursuant to Rule 58, Fed.R.Civ.P.