**Irving WEISLER, Plaintiff,**

v.

**METAL POLISHERS UNION & METAL PRODUCTION & NOVELTY WORKERS UNION 8A–28A, Metal Polishers Union Local 8A–28A Pension Fund and Metal Polishers Union Local 8A–28A Welfare Fund, Defendants.**

**No. 80 Civ. 3857 (JMC).**

United States District Court, S. D. New York.

Feb. 3, 1982.

Joel Levy, New York City (Jan B. Kabas, of counsel), for plaintiff.

Sturm & Perl, New York City (Robert Kruger, New York City, of counsel), for defendants.

## OPINION

CANNELLA, District Judge:

After a trial on the merits of plaintiff's amended complaint and defendants' counterclaims, the Court finds for plaintiff on his claim against defendant Metal Polishers Union & Metal Production & Novelty Polishers Union 8A–28A [the "Union"] for bo-

nus pay, and for the Union on its counterclaim for $2,000. The Court also finds for defendant Metal Polishers Union Local 8A–28A Pension Fund and Metal Polishers Union Local 8A–28A Welfare Fund [the "Funds"] on their counterclaims against plaintiff.

## FACTS

Plaintiff commenced this action in Civil Court, New York County on June 20, 1980. Thereafter, defendants removed the action to this Court pursuant to 28 U.S.C. § 1441(a) and the Employee Retirement Income Security Act ["ERISA"], 29 U.S.C. §§ 1001- 1144. Plaintiff is seeking damages from the Funds on the grounds that they improperly withheld from him (1) payment of part of his pension, (2) the proceeds of a deferred compensation plan, and (3) two weeks vacation pay and one week of bonus pay.[1] Plaintiff is also seeking to recover $4,000 in severance pay from the Union. The Funds have asserted several counterclaims seeking to recover portions of the salary plaintiff received from the Funds for the years 1975 to 1979 which the Funds consider excessive and therefore violative of ERISA. See 29 U.S.C. §§ 1106(b), 1109. The Union has also asserted a counterclaim seeking to recover $2,000 it paid plaintiff as part of his severance pay agreement.[2]

The following are the Court's findings of fact: Plaintiff joined Local 8A of the Metal Polishers Union in August 1937[3] and became its President in 1939. In 1941, Local 8A of the Metal Polishers Union and Local 28A of the Metal Production & Novelty Polishers Union merged and plaintiff was elected President of the newly merged local. Plaintiff remained in that position until his retirement in 1977. During his

---

1. In his amended complaint, plaintiff sought recovery of his bonus pay from the Funds. The proof at trial established, however, that it was the Union, and not the Funds, which denied plaintiff his bonus. Accordingly, the Court hereby deems the amended complaint to be further amended to conform to the proof adduced at trial. Fed.R.Civ.P. 15(b).

2. The Union had asserted a second counterclaim for tax refunds allegedly received by

plaintiff for the years 1973 to 1977. This claim, however, was withdrawn. See Joint Pretrial Order at 15 (filed Oct. 14, 1981).

3. See Plaintiff's Exhibit 10 at 10 [hereinafter plaintiff's exhibits will be referred to as PX —, and defendants' exhibits will be referred to as DX —]; Transcript of Trial at 3 [hereinafter "Tr."].

tenure, plaintiff never faced opposition in a union election; indeed, he does not recall any individual running on his slate ever being defeated in an election.[4] Between 1941 and 1960 plaintiff received a salary as Union President of approximately $60 per week. From 1961 to 1978 plaintiff received several salary increases and when he retired in 1977 his salary was $24,300.[5]

In 1948, the Union and a group of employers executed a Welfare & Pension Agreement [the "Agreement"] creating both the Welfare and Pension Funds.[6] The Funds are managed by three union-appointed and three employer-appointed trustees [the "Trustees"] who are assisted by an administrator who oversees the Funds' day-to-day operations. Plaintiff was appointed as the Funds' first administrator.[7] As administrator, plaintiff initially was responsible for the management and distribution of benefits, as well as for the collection of employer contributions. Plaintiff received no compensation for his work as administrator until 1961, at which time each fund began paying him a salary of $125 per week, for a total of $250.[8]

In 1972 an agreement between plaintiff and the Funds was reached whereby the Funds were to purchase from the Travelers Insurance Company ["Travelers"] on behalf of plaintiff an annuity contract as part of a deferred compensation plan.[9] This agreement initially provided that the Funds would contribute $60 per week per fund toward this plan. The first payments toward the deferred compensation plan were made on March 1 and April 1, 1974.[10] On October 23, 1974, the Trustees doubled the amount that the Funds contributed to plaintiff's deferred compensation plan,[11] and on December 5, 1979, the Trustees unanimously executed a resolution directing Travelers to pay the proceeds of the plan, which by then amounted to $96,336.79, to plaintiff.[12]

On October 16, 1974, the Union's Executive Board approved a motion retaining plaintiff as nonpaid president as of January 1, 1975.[13] Upon leaving the presidency, the Union promised, among other things, to pay plaintiff $6,000 in severance pay, of which only $2,000 has actually been paid to plaintiff to date.[14] Plaintiff nevertheless contin-

---

4. See Tr. at 10, 72.

5. See Tr. at 59. Plaintiff officially retired on January 21, 1978, and received $1,600 in compensation for his three weeks of service in 1978. Id.

6. See PX 12, 13. Actually, as part of a collective bargaining agreement, the Union and a group of employers executed two separate but virtually identical documents—one creating the pension fund, the other creating the welfare fund. These documents are identical in all portions pertinent to this litigation. The Court has, therefore, considered and referred to both documents as if they were a single agreement.

7. See Tr. at 8.

8. See Tr. at 10–11.

9. See Tr. at 11–12; PX 1, 2. The agreement was formally ratified by the Trustees on June 24, 1974.

10. On March 1, 1974, the pension fund sent a check for $7,020 to Travelers. See DX K. The welfare fund sent a check for the same amount on April 1, 1974. See DX L. These amounts represented the deferred compensation which had accrued from January 1, 1972 through

March 31, 1974. See PX 18. Plaintiff co-signed both of these checks. See DX K, L; Tr. at 81.

11. See PX 3; Tr. at 14–15.

12. The plan now has a net worth in excess of $105,000. See Tr. at 78. Plaintiff with his own funds has made a number of contributions to the plan and he is entitled to have those funds returned to him. Defendants have represented to the Court that the actual value of plaintiff's contributions can be ascertained, and the Court directs defendants to do so and to return that amount to plaintiff.

13. See PX 16.

14. The agreement provides in part:
 Motion made and seconded that President Weisler be retained as a non-payed [sic] President of the local as of Jan. 1, 1975. Upon leaving the Presidency he will receive the following—
 . . . .
 4. receive six thousand dollars net severance pay . . . .
 In the event that the President is allowed to [sic] by law to hold both paying positions as

ued to receive a salary from the Union until 1978.[15] Although he claims not to have devoted significant time to union matters from 1975 through 1978, plaintiff took direct responsibility for servicing several collective bargaining agreements and actively attempted to settle an eleven-week strike in 1977.[16]

On October 23, 1974, in addition to doubling plaintiff's deferred compensation, the Trustees approved an increase in plaintiff's salary as administrator of the Funds to $350 per week per fund effective January 1, 1975.[17] The Trustees took this action because they believed that ERISA, which was to take effect January 1, 1975, precluded plaintiff from serving as both salaried administrator of the Funds and as a salaried union official. Moreover, after Angelo La Barbera, a Trustee of the Funds and Vice President of the Union, represented to the Trustees that the Union had discontinued payment of plaintiff's salary, his salary as administrator was increased to offset this loss in income.[18]

On January 22, 1975, at a meeting attended by plaintiff,[19] the Trustees rescinded the salary increase approved for him on October 23, 1974.[20] Plaintiff's salary, however, was never reduced in accordance with this resolution. In fact, at plaintiff's request, it was

_increased_ by the Trustees on February 23, 1977, from $15,600 per fund to $26,000 per fund per year, retroactive to January 1, 1977.[21] Plaintiff sought this increase because he claimed that the requirements of ERISA had substantially increased his workload and responsibilities.[22] The Trustees, however, conditioned this increase upon the receipt of a letter from the Funds' accountants stating that the increase was reasonable and consistent with ERISA. On March 28, 1977, the Funds' certified accountants sent a letter to the Trustees in accordance with their request.[23]

As administrator of the Funds, plaintiff supervised the work of three secretaries; consulted with financial advisors on the Funds' investment decisions; prepared pension calculations and submitted them to the Trustees; ensured that the actuarial information and insurance contracts of the Funds were current; co-signed and distributed checks on behalf of the Funds;[24] and acted as an advisor to Union members concerning their rights under the Agreement.[25] In addition to his other duties as administrator, plaintiff supervised the management of the building which housed both the Funds' and the Union's offices, and performed minor repairs when needed.[26] Al-

President of the local and Administrator of the Pension and Welfare fund the above aforementioned will be null and void. _See_ PX 16; Tr. at 35–40.

**15.** Plaintiff received a salary as Union President of $13,500 in 1973, $18,700 in 1974, $26,600 in 1975, $21,200 in 1976, $24,300 in 1977 and $1,600 in 1978. _See_ Tr. at 59.

**16.** _See_ Tr. at 54–55, 60–62.

**17.** _See_ Tr. at 14–16; PX 3, 4.

**18.** _See_ PX 3 at 1; Tr. at 149.

**19.** Although plaintiff testified on direct examination that he did not attend this meeting, _see_ Tr. at 16, on cross-examination he acknowledged that in fact he did attend, _see_ Tr. at 107. Moreover, the minutes of the meeting and the testimony of Angelo La Barbera clearly place plaintiff at this meeting. _See_ PX 4; Tr. at 151.

**20.** Although on January 22, the Trustees rescinded plaintiff's salary increase, they did not revoke the doubling of his deferred compensation. _See_ PX 4 at 2.

**21.** _See_ PX 8 at 3–4.

**22.** _See_ Tr. at 25–26.

**23.** _See_ PX 9; Tr. at 26–27.

**24.** _See_ Tr. at 62–69. Although all the Funds' checks had to be countersigned by an employer trustee, plaintiff's practice was to have employer trustees sign blank checks. He would then issue checks as he saw fit. _See_ Tr. at 113–15; 194–95.

**25.** _See_ Tr. at 63–64.

**26.** In 1978, plaintiff was also named Trustee and administrator of the Union's Education and Scholarship Fund. As administrator of this fund, plaintiff supervised the work of one part-time secretary and assisted in the publication of a newsletter for which he received, in addition to his other compensation, a salary of $10,000 in 1978 and $13,250 in 1979. _See_ Tr. at 51–52, 59.

though plaintiff was available at any time to handle any problem concerning the Funds, he only spent ten to twelve hours per week physically in the Funds' offices.[27]

In 1978, because the Union had understated his income to the Internal Revenue Service, plaintiff incurred a tax deficiency of approximately $8,500. To cover this deficiency, plaintiff sought an increase in salary from the Funds.[28] Initially, the Trustees were reluctant to grant this increase because they believed it to be an unreasonable request.[29] On June 21, 1978, however, after plaintiff had made a number of phone calls to individual Trustees, his salary was increased by $7,500.[30]

On March 7, 1979, the Trustees ratified an employment contract with plaintiff which guaranteed him a salary of $52,000 for the year ending December 31, 1979.[31] On December 5, 1979, the Trustees unanimously approved the payment to plaintiff of the proceeds of his deferred compensation plan,[32] but refused plaintiff's request for vacation pay.[33] Previously, on October 18, 1979, the Trustees approved a pension of $2,480.85 per month for plaintiff.[34] Plaintiff retired as administrator of the Funds as of December 31, 1979, and in January 1980 received his first pension check for approximately $1,900. He continued to receive checks for $1,900 until May 1980.[35]

On April 30, 1980, the Trustees, after a review of plaintiff's payroll records, determined that he joined the Union in 1941, not 1934 as he reported in his pension application. Accordingly, after denying plaintiff seven years of service credit, the Trustees reduced his pension to $1,238.88 per month.[36] The Trustees further determined that the deferred compensation plan executed on behalf of plaintiff was excessive and therefore unanimously refused to authorize payment of its proceeds to plaintiff. On May 21, 1980, the Trustees informed plaintiff by letter of these actions.[37]

On January 15, 1981, after plaintiff instituted this lawsuit, the Trustees reconsidered the reasonableness of plaintiff's compensation as the Funds' administrator.[38] At this meeting the Trustees determined that (1) for the purposes of pension calculation plaintiff became a member of the Union in August 1937 and (2) the compensation plaintiff received as administrator of the Funds for the years 1975 through 1979 was excessive and unreasonable.[39] The Trustees, therefore, decided that the salary plaintiff received as administrator between 1975 and 1979 could not be considered in determining his pension. The Trustees also decided that the portion of the salary plaintiff received as Union president for the

---

27. Plaintiff has argued that on three afternoons each week he conducted meetings at a local restaurant, the Weathervane. Although the Court does not doubt that plaintiff did regularly meet a number of individuals at the Weathervane, the business which plaintiff conducted appears to have concerned the Union and the Education and Scholarship Fund, and not plaintiff's duties as administrator of the pension and welfare funds. *See* Tr. at 129–31, 137–40.

28. *See* DX C; Tr. at 48–49.

29. *See* Tr. at 157–59, 200.

30. *See* Tr. at 159, 200–01.

31. *See* PX 11 at 3, 5–6; Tr. at 29–30. The present administrator of the Funds receives $18,000 per year for his work and devotes between 20 and 30 hours per week to the Funds' management. *See* Tr. at 69–70.

32. *See* PX 5 at 5.

33. *Id.*

34. *See* PX 14 at 2. This pension was based on calculations supplied by plaintiff. *See* Tr. at 195.

35. *See* Tr. at 42, 92. Because plaintiff elected joint survivor benefits, his pension was reduced from $2,480.85 to $1,900 per month.

36. *See* PX 6 at 2.

37. *See id.*; DX R.

38. *See* PX 10. At the outset of the January 15, 1981 meeting, the Trustees were informed by counsel that "this meeting was the first opportunity that the Trustees had to consider the various components of Mr. Weisler's pension in a comprehensive manner, with relatively complete information regarding [his] income." *Id.* at 3.

39. *See id.* at 5–7, 10.

years 1974 through 1978 which exceeded his Union salary for 1973 was excessive and therefore could not be considered in the calculation of his pension.[40] Finally, because the Trustees determined that the Education and Scholarship Fund was not a contributing member to the welfare and pension funds within the terms of the Agreement, any compensation that plaintiff received from this Fund also could not be included in calculating his pension.[41]

The Trustees directed the Funds' administrator, Daniel Cook, to recompute plaintiff's pension, using 1973 as a base year for his salary as administrator and increasing that salary each year by the Bureau of Labor Standards Consumer Price Index for Urban Consumers in the New York-New Jersey Metropolitan Area.[42] Mr. Cook, following the directions of the Trustees, computed plaintiff's pension to be $1,109.45.[43] Plaintiff's pension was recalculated in June 1981 and since that time plaintiff has received a monthly pension of $1,138.54.[44] Also at the January 15, 1981, meeting, the Trustees reaffirmed their decision of April 30, 1980, not to authorize the payment of plaintiff's deferred compensation plan. The Trustees further authorized their attorneys to recoup the allegedly excessive compensation paid to plaintiff as administrator of the Funds.[45]

## DISCUSSION

■ Judicial review in this case is limited to determining whether the Trustees, in reducing plaintiff's pension and denying him the proceeds of his deferred compensation plan and two weeks vacation pay, acted arbitrarily or capriciously. *See Haeberle v. Board of Trustees*, 624 F.2d 1132, 1136 n.6 (2d Cir. 1980); *Valle v. Joint Plumbing Industry Board*, 623 F.2d 196, 203 (2d Cir. 1980); *Nass v. Staff Retirement Plan*, 515 F.Supp. 950, 958 (S.D.N.Y.1981). Moreover, ERISA does not require the Trustees to reach the best possible decision, but only one that has a rational justification. *See Riley v. MEBA Pension Fund*, 570 F.2d 406, 413 (2d Cir. 1977).

■ Plaintiff has argued that because the increases in his salary and deferred compensation had previously been approved by the Trustees, the actions they took on April 30, 1980, and January 15, 1981, were inconsistent with their prior decisions and therefore arbitrary and capricious.[46] Although a consistent course of conduct on the part of the Trustees is an indication of rational and justifiable action, *see, e.g., Gordon v. ILWU–PMA Benefit Funds*, 616 F.2d 433, 440 (9th Cir. 1980); *Bayles v. Central States, Southeastern & Southwestern Area Pension Funds*, 602 F.2d 97, 99 (5th Cir. 1979); *Snyder v. Titus*, 513 F.Supp. 926, 933 (E.D.Va.1981), inconsistent actions on the part of the Trustees is not *per se* arbitrary and capricious, *see Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1260 (5th Cir. 1980); *Fine v. Semet*, 514 F.Supp. 34, 43–44 (S.D.Fla.1981). In short, the Court will not disturb a Trustees' decision that has a reasonable and rational basis, whether it be consistent or inconsistent with prior actions they have taken.

Furthermore, as defendants quite correctly point out, 29 U.S.C. § 1105(a)(3)[47] re-

**40.** *See id.* at 3–4.

**41.** *See id.* at 9–10.

**42.** *See id.* at 12.

**43.** *See* DX S; Tr. at 174.

**44.** *See* Tr. at 184.

**45.** *See* PX 10 at 7–9.

**46.** Although not raised by plaintiff, the Court believes that reliance on an estoppel theory would be misplaced. To take advantage of the estoppel doctrine, a plaintiff must not only prove every element of the doctrine, *see Haeberle v. Board of Trustees, supra*, 624 F.2d at 1139; *Nass v. Staff Retirement Plan, supra*, 515 F.Supp. at 960 n.26, but must come before the Court with clean hands. In view of the Court's conclusion that plaintiff breached his fiduciary responsibilities on more than one occasion, *see* notes 53–55 *infra* and accompanying text, he has not come before the Court with clean hands and is therefore barred from raising the estoppel doctrine.

**47.** 29 U.S.C. § 1105(a)(3) provides:
 (a) In addition to any liability which he may have under any other provision of this

quires the Trustees to examine and if necessary rescind prior actions if such actions violated provisions of ERISA. Because the Court finds that the Trustees were justified in concluding that a number of actions taken by previous Trustees concerning plaintiff's compensation and pension were improper, the actions taken on April 30, 1980, and January 15, 1981, were reasonable and therefore not arbitrary and capricious.

### Plaintiff's Claims Against the Funds

■ Initially, the Court notes that plaintiff is both a fiduciary and a party-in-interest within the meaning of ERISA, *see* 29 U.S.C. § 1002(14), (21),[48] and therefore subject to the prohibitions of 29 U.S.C. § 1106(b)(2).[49] *See Gilliam v. Edwards*, 492 F.Supp. 1255, 1260–63 (D.N.J.1980); *M & R Investment Co. v. Fitzsimmons*, 484 F.Supp. 1041, 1057 (D.Nev.1980). Accordingly, plaintiff is held to a strict standard of undi-

---

part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
. . . .
(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

**48.** 29 U.S.C. § 1002(14) provides in pertinent part:
The term "party in interest" means, as to an employee benefit plan—
(A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan;
(B) a person providing services to such plan.
29 U.S.C. § 1002(21)(A) provides:
Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.
*See also* 29 C.F.R. § 2509.75–8 (D–3) (1980):

---

vided loyalty. Not only must he not become directly involved in a transaction or decision from which he might personally benefit, but he must not allow "himself to be placed in a position where his personal interest *might* conflict with the interest of the [Funds]." *Fulton National Bank v. Tate*, 363 F.2d 562, 571–72 (5th Cir. 1966) (emphasis in original). *See also Cutaiar v. Marshall*, 590 F.2d 523, 529–30 (3d Cir. 1979); *Marshall v. Kelly*, 465 F.Supp. 341, 351–53 (W.D.Okla.1978).

■ The evidence adduced at trial established that plaintiff actively participated in transactions that resulted in benefits being conferred upon him. Plaintiff not only attended meetings during which questions of his compensation were discussed,[50] but on more than one occasion he actively lobbied both union and employer trustees to approve increases in his compensation.[51]

---

D–3 Q: Does a person automatically become a fiduciary with respect to a plan by reason of holding certain positions in the administration of such plan?
A: Some offices or positions of an employee benefit plan by their very nature require persons who hold them to perform one or more of the functions described in section 3(21)(A) of the Act. For example, a plan administrator or a trustee of a plan must, be [*sic*] the very nature of his position, have "discretionary authority or discretionary responsibility in the administration" of the plan within the meaning of section 3(21)(A)(iii) of the Act. Persons who hold such positions will therefore be fiduciaries.

**49.** 29 U.S.C. § 1106(b) provides:
A fiduciary with respect to a plan shall not—
(1) deal with the assets of the plan in his own interest or for his own account,
(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

**50.** *See* PX 3, 4, 7, 8, 11; DX C, D; Tr. at 149–59.

**51.** *See* Tr. at 147–49, 201–03.

Moreover, the initial calculations of plaintiff's pension, which later were determined to be in error, were performed by plaintiff himself. Although he may have been acting in good faith, plaintiff is prohibited from actively participating in a decision from which he will directly or indirectly benefit. *See Iron Workers Local No. 272 v. Bowen, supra,* 624 F.2d at 1261; *Marshall v. Snyder,* 572 F.2d 894, 900 (2d Cir. 1978); *Brink v. DaLesio,* 496 F.Supp. 1350, 1367–68 (D.Md.1980); *Gilliam v. Edwards, supra,* 492 F.Supp. at 1260–63.

 The actions taken by the Trustees in reducing plaintiff's pension and denying him the proceeds of the deferred compensation plan were also justified by 29 U.S.C. § 1108(c).[52] Although plaintiff as administrator of the Funds was entitled to reasonable compensation, unreasonable or excessive compensation is clearly prohibited. *See Marshall v. Snyder, supra,* 572 F.2d at 901; *Grossman v. Mushlin,* 493 F.Supp. 330, 331 (S.D.N.Y.1980); *M & R Investment Co. v. Fitzsimmons, supra,* 484 F.Supp. at 1057. The Court finds the Trustees' determination that plaintiff's compensation as administrator was excessive to be reasonable and thus not arbitrary and capricious. Plaintiff's salary was increased in 1975 because the Trustees were led to believe that plaintiff was no longer a salaried union officer. Plaintiff, however, continued to receive his union salary in contravention of the understanding conveyed to the Trustees.[53] Moreover, after the Trustees rescinded plaintiff's increase on January 22, 1975, plaintiff still continued to pay himself the higher salary. Even if the Court were to find credible plaintiff's assertion that he did not know his salary had been reduced,[54] his good faith defense would still not prohibit the Trustees from deciding that the compensation he received was excessive. *See Riley v. MEBA Pension Fund, supra,* 570 F.2d at 410; *Brink v. DaLesio, supra,* 496 F.Supp. at 1367.

 Having determined that the Trustees acted rationally in deciding that plaintiff's compensation was excessive, the Court's ability to review the Trustee's decisions is limited. The Court cannot substitute its judgment for that of the Trustees as to what constitutes reasonable compensation for plaintiff's services as administrator unless the Trustees' determination is without justification. At trial, plaintiff failed to prove that the method chosen by the Trustees to recalculate his salary was arbitrary and capricious[55] and the Court upon independent reflection finds that the method adopted by the Trustees was both fair and reasonable. Moreover, in view of the fact that (1) no one else was ever awarded deferred compensation and (2) the Trustees correctly decided that plaintiff's regular salary standing by itself was excessive, the Court finds that the decision to deny plaintiff the proceeds of the deferred compensa-

---

**52.** 29 U.S.C. § 1108(c) provides:

Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from—

(1) receiving any benefit to which he may be entitled as a participant or beneficiary in the plan, so long as the benefit is computed and paid on a basis which is consistent with the terms of the plan as applied to all other participants and beneficiaries;

(2) receiving any reasonable compensation for services rendered. or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan; except that no person so serving who already receives full-time pay from an employer or an association of employers, whose employees are participants in the plan, or from an employee organization whose members are participants in such plan shall receive compensation from such plan, except for reimbursement of expenses properly and actually incurred; or

(3) serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest.

**53.** *See* note 15 *supra.*

**54.** Because plaintiff attended the January 22nd meeting, *see* Tr. at 16, 107; note 19 *supra,* the Court finds his assertion to be not credible.

**55.** Although plaintiff challenged the ability of defendants to recompute his salary, uncontroverted evidence adduced at trial established that tying salary increases to the Consumer Price Index is a reasonable and accepted practice. *See* Tr. at 180–81; PX 10 at 12.

tion plan was both reasonable and proper.[56] Merely because the Trustees previously authorized the payout of the compensation plan does not mean that a subsequent group of Trustees, pursuant to 29 U.S.C. § 1105(a)(3), cannot with justification rescind that decision. *See Valle v. Joint Plumbing Industry Board, supra,* 623 F.2d at 203; *Morrissey v. Curran,* 567 F.2d 546, 548–49 (2d Cir. 1977); *Gilliam v. Edwards, supra,* 492 F.Supp. at 1264.[57]

■ The Court also finds that plaintiff's claim for vacation pay is without merit. In a meeting on December 5, 1979, the Trustees clearly denied plaintiff's claim and the Court sees no reason to disturb that decision.[58]

### Plaintiff's Claims Against the Union and the Union's Counterclaim

Plaintiff has asserted two claims against the Union. The first claim is for $4,000, representing the balance allegedly due plaintiff as severance pay. The second claim is for bonus pay to which plaintiff asserts he is entitled and which the Union has failed to pay him.[59] The Union, in turn, has counterclaimed for the $2,000 in severance pay which it asserts was wrongfully paid to plaintiff. The Court finds that plaintiff has satisfied his burden of proof with respect to his claim for bonus pay but finds for the Union on its counterclaim for $2,000.

■ Plaintiff's claim for severance pay is based on an agreement reached between the Executive Board of the Union and plaintiff on October 16, 1974.[60] The agreement provides for the payment of $6,000 to plaintiff "upon leaving the presidency," [61] but this payment is conditioned on plaintiff *not* being allowed to remain as both paid president of the Union and administrator of the Funds.[62] The Union maintains that because plaintiff continued to serve as salaried Union president after accepting this partial payment, the original agreement is now null and void. Although the severance pay that plaintiff seeks is something all other Union officers received upon retirement,[63] his entitlement to this pay was expressly conditioned upon his not serving as both salaried Union president and Funds' administrator. The evidence adduced at trial clearly established that this condition was not satisfied.[64] Accordingly, the Union was correct in denying plaintiff the balance of his severance pay and is entitled to recoup the $2,000 it previously paid to plaintiff.

---

**56.** In instances in which a retroactive decision either modifies or denies an individual's pension rights, courts have required trustees to establish an actuarial basis for the retroactive action. *See Rosen v. Hotel & Restaurant Employees,* 637 F.2d 592, 597 (3d Cir. 1981); *Valle v. Joint Plumbing Indus. Bd.,* 623 F.2d 196, 203 (2d Cir. 1980). Although defendants have produced little evidence on this point, the Court notes that in decisions concerning the fiscal integrity of pension funds trustees should be accorded wide latitude, *see Bayles v. Central States, S.E. & S.W. Area Pension Funds,* 602 F.2d 97, 100 (5th Cir. 1979); *Fine v. Semet,* 514 F.Supp. 34, 43–44 (S.D.Fla.1981), and plaintiff has failed to establish that defendants' actions contradicted notions of fundamental fairness. *See Valle v. Joint Plumbing Indus. Bd., supra.*

**57.** Although not raised by any of the parties, the Court notes that Article VIII of the Agreement provides that arbitration is the "sole and exclusive [procedure] available to a participant or beneficiary of a participant who is dissatisfied with an eligibility determination, or benefit award, or who is otherwise adversely affected by any action of the Trustees," provided that a request for arbitration is made within sixty days after the receipt of a written decision of the Trustees. *See* PX 12 at 15; PX 13 at 14. The evidence adduced at trial does not indicate whether plaintiff ever made such a request for arbitration. Defendants, however, have never raised this as a defense and the Court finds that in failing to do so they have waived any possible defense based thereon.

**58.** *See* PX 5 at 5.

**59.** *See* note 1 *supra.*

**60.** *See* PX 16.

**61.** *Id.* at 1.

**62.** *Id.* at 1–2.

**63.** *See* Tr. at 99–100.

**64.** Plaintiff testified that he received compensation from both the Union and the Funds through January 1978. *See* Tr. at 59.

The Union's failure to pay plaintiff the bonus pay given to all other Union officers is, however, unjustified. The testimony of Angelo La Barbera clearly supports plaintiff's contention that he is entitled to bonus pay,[65] and the Union failed to offer any evidence to dispute plaintiff's claim.[66] The Court, therefore, finds that plaintiff is entitled to one week's bonus pay from the Union.[67]

### The Funds' Counterclaims Against Plaintiff

The Funds have asserted ten counterclaims seeking to recoup that portion of plaintiff's salary from 1975 through 1979 which exceeded his salary as recomputed by the Trustees. The Trustees have argued that, pursuant to 29 U.S.C. § 1109,[68] plaintiff must repay that portion of his salary found to be excessive. *See generally Brink v. DaLesio, supra,* 496 F.Supp. at 1369;

*Grossman v. Mushlin, supra,* 493 F.Supp. at 333; *Gilliam v. Edwards, supra,* 492 F.Supp. at 1264; *M & R Investment Co. v. Fitzsimmons, supra,* 484 F.Supp. at 1057–58. The Court must permit the Trustees to undo prohibited transactions to the extent possible, "but in any case, [place] the plan in a financial position not worse than that in which it would be if [plaintiff] were acting under the highest fiduciary standards." 26 U.S.C. § 4975(f)(5). *See also Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 642 n.5 (W.D.Wis.1979); *M & R Investment Co. v. Fitzsimmons, supra,* 484 F.Supp. at 1057. Having decided that plaintiff's compensation as administrator was excessive, the Trustees determined that plaintiff must reimburse the Fund and be denied the proceeds of the deferred compensation plan in order to restore the Fund to its former fiscal position.[69] The Court finds this determination to be a proper one and, there-

**65.** *See* Tr. at 165–66:

THE COURT: Now, how about this business about the Christmas bonus, did everybody get a Christmas bonus in the union?
THE WITNESS: In the union?
THE COURT: In the union or in the welfare and pension fund.
THE WITNESS: Well, in the union, normally the officers at the end of the year were given a small Christmas bonus.
THE COURT: Like about a week's wages?
THE WITNESS: No, no, the officers, the only ones who were paid by the union were the business agent, the girl in the office and the president. But he did give a token bonus to the officers.
THE COURT: What would the president get?
THE WITNESS: That I don't know.
THE COURT: What do you get?
THE WITNESS: I get a week's wage.
THE COURT: It is just coincidental that you also get the week he's claiming?
THE WITNESS: The first year I was there it came Christmastime, he was still on the premises, I called him up and asked him what was his practice for the union people and he told me and I did the same thing.

**66.** The Union has not asserted that payment of one week's bonus pay to plaintiff would violate 29 U.S.C. § 501, or any other provisions of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 401–531.

**67.** Although plaintiff worked three weeks in January 1978, based on equitable considerations the Court concludes that plaintiff's 1977 salary should be used for the purposes of deter-

mining his bonus. Therefore, plaintiff's bonus amounts to $484.63.

**68.** 29 U.S.C. § 1109 provides:

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

(b) No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

**69.** In the amended answer the Funds have asserted counterclaims for a total of $93,538.94, representing unreasonable compensation paid to plaintiff by the Funds from 1975 through 1979. In their third and eighth counterclaims, the Funds alleged that plaintiff's salary in 1975 was $35,990. The evidence adduced at trial, however, established that plaintiff's 1975 salary was $33,800. *See* DX A. Therefore, the Funds are only entitled to $91,714.47 on their counterclaims.

fore, finds for the Funds on their counterclaims. *See* 29 U.S.C. § 1109.

## CONCLUSION

In accordance with the foregoing, after a trial on the merits of plaintiff's amended complaint and defendants' counterclaims, the Court finds for plaintiff on his claim against the Union for bonus pay in the amount of $484.63, and for the Union on its counterclaim for $2,000. The Court further finds for the Funds on plaintiff's claims for increased pension benefits, the proceeds of his deferred compensation plan, and vacation pay. Finally, the Court finds for the Funds on their counterclaims in the total amount of $91,714.47. The Court directs the Funds to determine the exact amount contributed by plaintiff to his deferred compensation plan and return said amount to plaintiff within fifteen days of the date of this Opinion.[70]

These are the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

Defendants are to submit Judgment on notice.

SO ORDERED.